211 B.R. 116 (1997)
In re Michael Peter HARKO and Margaret Grace Harko, Debtors.
KEY BANK OF NEW YORK, Appellant,
v.
Michael Peter HARKO and Margaret Grace Harko, Appellees,
Andrea E. Celli, Trustee.
In re Ronald P. MILHAM and Benedetta Milham, Debtors.
KEY BANK OF NEW YORK, Appellant,
v.
Ronald P. MILHAM and Benedetta Milham, Appellees,
Andrea B. Celli, Trustee.
BAP Nos. 96-50031, 96-50033, Bankruptcy Nos. 96-11076, 96-12157.
United States Bankruptcy Appellate Panel of the Second Circuit.
Argued May 2, 1997.
Decided July 31, 1997.
*117 Hodgson, Russ, Andrews, Woods & Goodyear, LLP by Annette M. Tambasco, Albany, NY, for Appellant.
Martin J. Goodman, Albany, NY, for Appellees Ronald P. Milham and Benedetta Milham.
Andrea E. Celli, Albany, NY, trustee.
Before LIFLAND C.J., and KAPLAN and NINFO, JJ.
BURTON R. LIFLAND, Chief Judge.
Two appeals are before us. In neither are the relevant facts in dispute. Both concern the same issue of law, namely whether an oversecured creditor in a case under Chapter 13 of the Bankruptcy Code (the "Code"), 11 U.S.C. §§ 1301-1330, is entitled to its contractual rate of interest pursuant to § 506(b) of the Code post-confirmation. The appellant in both cases is Key Bank of New York ("Key Bank"). The Debtors-Appellees in the first appeal, Michael and Margaret Harko (the "Harkos"), owed Key Bank $3,599.31 under a retail installment contract (the "Harko Contract"), secured by a 1991 Ford Explorer, the average National Automobile Dealers Association (NADA) value of which was $13,300. The Debtors-Appellees in the second appeal, Ronald and Bendetta Milham (the "Milhams"), owed Key Bank $3,163.07 under a retail installment contract (the "Milham Contract"), secured by a 1991 Lincoln Town Car the value of which was $11,962.50, according to Key Bank and $8,713.00 according to the Milhams. In any event, in both cases Key Bank is oversecured. In their respective Chapter 13 plans, the Harkos proposed payment to Key Bank of $3,555.00 with no interest while the Milhams proposed payment to Key Bank of $3,000 plus interest at 8.5% per annum. The contractual rate of interest under the Harko Contract was 13.95% per annum and under the Milham Contract it was 9.5% per annum. Key Bank filed objections to the respective plans, claiming that it was entitled to the contractual rate of interest pursuant to § 506(b) of the Code post-confirmation on its oversecured claims. The bankruptcy court overruled such objections, holding that the oversecured claim holder is entitled to interest at the prepetition contract rate under § 506(b) only up to the effective date of the Chapter 13 plan: the interest rate applicable post confirmation is that which provides the "present value" of the allowed secured claim. The court approved a 9% interest rate in the case of the Harkos and an 8.5% interest rate in the case of the Milhams.
In the Milham appeal, we have had the benefit of the briefs of Key Bank, of an amicus curiae, the New York State Credit Union League, Inc., of the Milhams and of the Chapter 13 Trustee, Andrea E. Celli. In the Harko appeal, we have the briefs of Key Bank and of Ms. Celli.
Standard of Review
The facts are undisputed and the issue is one purely of law. The standard of review, accordingly, is de novo. Bellamy v. Federal Home Loan Mortgage Corp. (In re Bellamy), 962 F.2d 176, 178 (2d Cir.1992).
Discussion
The starting point of our inquiry is a review of the statutory provisions in question and, in the first place, § 1325 of the Code which sets forth the circumstances under which the bankruptcy court may confirm a Chapter 13 debtor's reorganization plan. Section 1325 provides, in material part, that:
(a) . . . the court shall confirm a plan if-
. . .
(5) with respect to each allowed secured claim provided for by the plan-

*118 (A) the holder of such claim has accepted the plan;
(B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder; . . .
See 11 U.S.C. § 1325(a). Under this provision, a plan's proposed treatment of secured claims can be confirmed if one of three conditions is satisfied: the secured creditor accepts the plan; the debtor surrenders the property securing the claim to the creditor; or the debtor invokes the so-called "cramdown" power. See Associates Commercial Corporation v. Rash, ___ U.S. ___, ___ - ___, 117 S.Ct. 1879, 1881-83, 138 L.Ed.2d 148 (1997). Under the cramdown option, the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim. See id.
With regard to the determination of the "allowed amount of [the] claim," we look first to § 502 of the Code which deals with the allowance and disallowance of claims. Under this section, a claim may become allowed in any of three ways: first, a proof of claim is filed and no party objects; second, a claim is allowed by the court after an objection is filed; and third, a claim is estimated by the court under the provisions of § 502(c). See 4 Collier on Bankruptcy ¶ 502.01 (15th ed. rev.1996). A claim may be disallowed under any of the subsections of § 502(b) or under § 502(d) and (e). See id. For present purposes we need only concern ourselves with § 502(b)(2), pursuant to which, as a general rule, interest on prepetition claims stops accruing as of the date of the filing of the bankruptcy petition.[1]
With regard to secured claims, however, § 506 of the Code must also be considered. Section 506(a) deals generally with the determination of secured status. It does not govern the allowance of claims.[2] Section 506(b), on the other hand, does affect the quantum of the allowed secured claim and provides the exception to the general rule that interest stops accruing as of the filing of the bankruptcy petition. Section 506(b) provides:
(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection
(c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.
11 U.S.C. § 506(b). Thus, § 506(b) provides that an oversecured creditor is ordinarily entitled to postpetition interest on his claim.[3] *119 Such interest becomes part of the creditor's allowed claim. This is apparent from the legislative history which states, with respect to fees, costs and charges:
Subsection (b) codifies current law by entitling a creditor with an oversecured claim to any reasonable fees, costs, or charges provided under the agreement under which the claim arose. These fees, costs, and charges are secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.
H. Rep. No. 95-595 at 356, 357 (1977); S.Rep. No. 95-989 at 68 (1978) U.S.Code Cong. & Admin.News 1978, pp. 6312-13 (emphasis added). There is nothing in the language of § 506(b) to suggest that interest, as opposed to fees, costs and charges, should be treated any differently and the majority of courts have so held. See, e.g., Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta Resources, Inc.), 54 F.3d 722, 729 (11th Cir.1995) ("[A]n oversecured creditor . . . is entitled to receive postpetition interest as part of its claim at the time of confirmation of a plan or reorganization. . . .")[4]; In re DeMaggio, 175 B.R. at 150 ("[S]ection 506(b) determines the exact amount of the claim. . . ."); In re Foertsch, 167 B.R. 555, 560 (Bankr.D.N.D.1994) ("[S]ection 506(b) allows an oversecured creditor to enhance its claim by adding to it postpetition interest. . . ."); Warehouse Home Furnishings Distributors, Inc. v. Gladdin (In re Gladdin), 107 B.R. 803, 806 (Bankr.M.D.Ga.1989) ("[P]ostpetition interest actually becomes part of the secured claim. . . ."); In re Busone, 71 B.R. 201, 203 (Bankr.E.D.N.Y.1987) ("Section 506(b) determines the exact amount of the allowed secured claim. . . ."); In re Hugee, 54 B.R. 676, 678-79 (Bankr.D.S.C. 1985) ("The creditor is entitled to receive the contract rate of interest until the effective date of the plan  at which time the accumulated interest becomes a part of the allowed secured claim."); In re Corliss, 43 B.R. 176, 178 (Bankr.D.Or.1984) ("The language of § 506(b) suggests the inclusion of post-petition interest as part of the allowed secured claim. . . ."); In re Webb, 29 B.R. 280, 286 (Bankr.E.D.N.Y.1983) ("[S]ection 506(b) incorporates contractual provisions to fix the total secured claim."); In re Klein, 10 B.R. 657, 661 (Bankr.E.D.N.Y.1981) ("For purposes of fixing the value of a creditor's secured claim, [s]ection 506(b) permits the secured claim to include . . . interest. . . ."). Indeed, the Supreme Court in Rake v. Wade, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) speaks of interest as "part of the oversecured claim under § 506(b)." Id. at 471, 113 S.Ct. at 2192. Thus, the "allowed amount" of the oversecured creditor's claim will include, for purposes of § 1325(a)(5)(B)(ii), a sum representing postpetition interest. The value of property to be distributed under a Chapter 13 plan to an oversecured creditor may not be less than this amount.[5]
In addition, it is now well settled that full payment under § 1325(a)(5)(B)(ii) includes a "present value" component. See General Motors Acceptance Corp. v. Valenti (In re Valenti), 105 F.3d 55, 63 (2d Cir.1997).[6] As the Second Circuit stated in In re Valenti, in theory, a creditor who receives the "present value" of its allowed claim is placed in the same economic position that it would have *120 been in had it received the value of its allowed claim on the date the reorganization plan was confirmed, see id., and in In re Bellamy, the Second Circuit held that to compensate the creditor for its inability to use the money owed it while payments under the plan were being made, "section 1325 requires market rate interest in addition to payments on the allowed secured claim itself." 962 F.2d at 185-86.
While Key Bank does not espouse such result, if, as Key Bank argues, § 506(b) interest continues to accrue postconfirmation, we would observe that it follows from our foregoing discussion that a sum for such unmatured interest would have to be calculated as part of the "allowed amount" of the claim and the secured creditor would be entitled to the present value of this enhanced sum with the result that the debtor would be obligated to pay present value interest on unmatured interest. See In re Gladdin, 107 B.R. at 806; In re Corliss, 43 B.R. at 178. Such a result would produce a windfall to oversecured creditors and be wholly at odds with the objective of § 1325(a)(5)(B)(ii), which is "to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately." In re Valenti, 105 F.3d at 63.
The substitution of a contract rate of interest for present value interest, on the other hand, would be inconsistent with the objective of § 1325(a)(5)(B)(ii) as stated in In re Valenti and the rejection by the Valenti court of the "forced loan" approach. The Second Circuit stated that "[t]he purpose [of § 1325(a)(5)(B)(ii)] is not to put the creditor in the same position that it would have been in had it arranged a `new' loan" and cited with approval In re Dingley, 189 B.R. 264 (Bankr.N.D.N.Y.1995) which noted that "courts favoring the coerced loan theory impermissibly recast present value `so as to preserve the present value of the loan' as opposed to the secured claim." Id. at 269 (quoting Zywicki, T., Cramdown And The Code: Calculating Cramdown Interest Rates Under The Bankruptcy Code 19 T. Marshall L.Rev. 241, 252 (Spring 1994)). See In re Valenti, 105 F.3d at 63-64. Similarly, the Second Circuit in In re Valenti cited with approval In re Hudock, 124 B.R. 532, 534 (Bankr.N.D.Ill.1991) ("[T]he Bankruptcy Code protects the creditor's interest in the property, not the creditor's interest in the profit it had hoped to make on the loan."). Otherwise, the creditor will receive more than the present value of its allowed claim. 105 F.3d at 64 (citing In re Cellular Info. Sys., Inc., 171 B.R. 926, 939 (Bankr.S.D.N.Y. 1994)).[7]
Of crucial importance, too, are the provisions of § 1322(b)(2) of the Code.[8] Section 1322(b)(2) authorizes debtors to modify the rights of secured claim holders, though it proscribes modification of the rights of holders of claims secured only by the debtor's principal residence. The language of the section is plain and the legislative history indicates the exception to the general rule that the rights of holders of secured claims may be modified in a Chapter 13 plan to be a very narrow one limited only to the rights of the mortgagee of the debtor's principal residence, an exception crafted to satisfy the home mortgage lending industry.[9] 124 *121 Cong. Rec. H11106, H11107-H1115 (Sept. 28, 1978). There is no such exception for oversecured creditors.
Thus, the Ninth Circuit in Shearson Lehman Mortgage Corp. v. Laguna (In re Laguna), 944 F.2d 542 (9th Cir.1991), cert. denied, 503 U.S. 966, 112 S.Ct. 1577, 118 L.Ed.2d 219 (1992), considered that the oversecured creditor's right to postpetition interest is qualified by, and must be understood in the context of, the interplay that exists between §§ 1322(b) and 1325(a) with respect to modification and cure and stated that "[t]he cramdown route necessarily involves a modification of the creditor's rights with regard to such factors as number of payments and the rate of interest." Id. at 544-45. Similarly, in In re Smith, 178 B.R. 946 (Bankr.D.Vt.1995), addressing the rights of an oversecured creditor in Chapter 12, the court recognized the overriding nature of § 1322(b) thus:
Use of the contract rate is claimed by its proponents to be the best way to determine the market rate because it is usually at arm's length and presumably reflects current interest rates, the current cost of money, and accounts for risk and costs. These arguments sink in the Bankruptcy Code waters because Courts do not award profit, administration costs, risk, industry transactional costs, costs of collection, and all those other myriad elements that go into a contract rate. Moreover, the Code authorizes a debtor to change its creditors' contract rights. §§ 1123(b)(1), 1222(b)(2), 1322(b)(2).
Id. at 953.
The dissent herein takes issue with In re Smith's conclusion that bankruptcy courts "do not award profit, administration costs, risk, industry transactional costs, costs of collection, and all those other myriad elements that go into a contract rate." However, the concept that profit is not an element of present value interest is not, as the dissent claims, without its authority. The Second Circuit in In re Valenti, 105 F.3d at 63, expressly rejected the Third Circuit's argument in General Motors Acceptance Corp. v. Jones, 999 F.2d 63 (3d Cir.1993) that "it would be inappropriate to attempt to exclude consideration of `profit' from a determination of the § 1325 interest rate," id at 69, instead approving In re Dingley and In re Hudock, as noted above.
In addition, the dissent, relying on Nobelman v. American Savings Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), argues that it is only contract rights, not statutory rights such as the oversecured creditor's right to postpetition interest under § 506(b), that may be modified under § 1322(b)(2).[10] We believe that the distinction that the Supreme Court was drawing in Nobelman was not between contractual rights on the one hand and statutory rights on the other. It was between modification of the rights of the holders of secured claims on the one hand and modification of secured claims on the other.[11] We do not read Nobelman as limiting the rights referenced in § 1322(b)(2).
Finally, contrary to the dissent's view, we do not believe that our analysis of the relationship between §§ 1325(a)(5)(B)(ii) and 506(b) is in any way inconsistent with the provisions of § 1322(b)(5) and (e). The curing of defaults pursuant to § 1322(b)(5) is a right conceptually distinct from Chapter 13 cramdown. It permits the debtor to take advantage of a contract repayment period which is longer than the Chapter 13 extension period, which may not exceed five years under any circumstances. 8 Collier on Bankruptcy *122 ¶ 1322.09[1] (15th ed. rev.1996) and see Matter of Chappell, 984 F.2d 775, 780 (7th Cir.1993). Thus, the debtor may "trade" its 1322(b)(2) right to modify contractual obligations (if applicable) for an extended repayment schedule under § 1322(b)(5). With regard to § 1322(e), enacted to overrule Rake v. Wade, the introductory language, which specifically references §§ 506(b) and 1325(a)(5), makes clear that these sections have no applicability in a cure situation. Thus, again, cure under § 1322(e) is conceptually distinct from cramdown. The cure provisions allow the debtor to keep the original contract in place and bring it up to date: they do not proscribe, and are not inconsistent with, prospective modification under the plan.
For all these reasons, we would hold that an oversecured creditor is entitled to receive interest pursuant to § 506(b) only until the effective date of the relevant Chapter 13 plan. At that time, the accumulated interest becomes part of its allowed secured claim and the plan must provide for payment to it of at least the present value of such allowed claim. In so holding, we are in accord with the majority of courts which have considered the interplay of § 1325(a)(5)(B)(ii) and § 506(b), as a brief review will illustrate.[12]
For example, in In re Klein, the court explained the relationship between § 506(b) and § 1325(a)(5)(B)(ii) thus:
For purposes of fixing the value of a creditor's secured claim, [s]ection 506(b) permits the secured claim to include reasonable interest together with any reasonable fees, costs or charges provided for in the security agreement when the value of the collateral exceeds the amount of the allowed secured claim.
The discount rate, on the other hand, does not become part of the secured claim, but is instead incremental adjustments to the secured claim to compensate the creditor for depreciation of the collateral over the term of the plan.
In re Klein, 10 B.R. at 661 (citations omitted). In re Webb held that:
[S]ection 1325(a)(5) requires that the secured creditor receive not less than the present value of his allowed claim. Section 506, on the other hand, fixes that allowed secured claim. Therefore, as of the confirmation date, section 506(b) incorporates contractual provisions to fix the total secured claim. Thereafter, the Court, independently of the contract, must fix an interest factor such that the total of such deferred payments is equivalent to the receipt of the total claim today. By this method the secured party's rights are not modified but protected.
In re Webb, 29 B.R. at 286 (citations omitted). In In re Corliss, the court analyzed the relationship between § 506(b) and § 1325(a)(5)(B)(ii) thus:
As the value of the payments to be distributed under [§ 1325(a)(5)(B)(ii)] must at least equal the allowed amount of the creditor's claim one must first ask of what the "allowed amount of the claim" consists within the context of that subsection. The language of § 506(b) suggests the inclusion of post-petition interest as part of the allowed secured claim to the extent of the value of the collateral. This interest will accrue from the date the petition is filed *123 until the effective date of the plan. The secured creditor cannot, of course, receive any contract interest which is unmatured as of the effective date of the plan. To determine otherwise would obligate the debtor to pay the discount rate on unmatured interest and lead to payment of two forms of interest simultaneously.
In re Corliss, 43 B.R. at 178. The court in In re Hugee held that:
The creditor is entitled to receive the contract rate of interest until the effective date of the plan  at which time the accumulated interest becomes a part of the allowed secured claim. From that time forward the oversecured creditor is entitled to receive the discount rate.
In re Hugee, 54 B.R. 676. The court in In re Busone found § 1325(a)(5)(B)(ii) and § 506(b) to be "not in conflict, but complementary." In re Busone, 71 B.R. at 203. It reasoned that § 506(b) determines the exact amount of the allowed secured claim while § 1325(a)(5)(B)(ii) requires that the plan payments return the present value of that figure to the creditor. See id. In In re Gladdin, the court considered the interplay of § 506(b) and § 1325(a)(5)(B)(ii) and explained its view thus:
Section 506(b) permits a secured claim to include postpetition interest when the value of the collateral exceeds the amount of the allowed secured claim. This section allows an oversecured creditor to add interest that accumulates prior to confirmation to the secured claim awaiting distribution under the debtor's plan. This postpetition interest actually becomes part of the secured claim and may accrue until the effective date of the plan. Section 506(b) interest accrues from the date the petition is filed until the effective date of the plan. . . . Simply stated, section 506(b) interest becomes part of the allowed secured claim. It is the present value of this claim that must be paid under section 1325(a)(5)(B)(ii).
In re Gladdin, 107 B.R. at 806 (citations omitted). Accordingly, the court rejected the argument that an oversecured creditor could receive § 506(b) interest after confirmation. The interplay of §§ 506(b) and 1325(a)(5)(B)(ii) was addressed in In re DeMaggio thus:
Although § 506(b) and § 1325(a)(5)(B)(ii) both mandate a calculation of interest, there are different objectives underlying the actual selection of the interest rate under each section. As a result, the interest rate that will return the present value under the plan under § 1325(a)(5)(B)(ii) is not necessarily the same interest rate used to determine the allowed amount of the claim under § 506(b). While § 506(b) determines the exact amount of the claim as of the "effective date of the plan" § 1325(a)(5)(B)(ii) requires the payments made under the plan return the present value of that amount to the creditor. The two sections complement each other and together ensure the full payment of the value of the secured creditor's claim.
In re DeMaggio, 175 B.R. at 150 (citations omitted.)
Finally, no review of this topic would be complete without a mention of the Supreme Court's decision in Rake v. Wade. Courts have frequently cited Rake as authority for the proposition that under § 506(b), the oversecured creditor is entitled to postpetition interest on its claim until payment of the claim or the effective date of the plan. See, e.g., In re Foertsch, 167 B.R. at 560; In re Harris, 167 B.R. 813, 815 (Bankr.D.S.C. 1994); De Sarno v. County of Allegheny, 169 B.R. 329, 332 (Bankr.W.D.Pa.1994); In re Wilmsmeyer, 171 B.R. 61, 63 (Bankr. E.D.Mo.1994); In re DeMaggio, 175 B.R. at 147. In fact, the contrary was never argued as the respondent in Rake conceded, and his amicus the United States agreed, that because § 506(b) had the effect of allowing a claim to the creditor, the rights granted under § 506(b) were relevant only until confirmation of the plan. See 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424. Nevertheless, the court, citing 3 Collier on Bankruptcy ¶ 506.05, p. 506-43, and n. 5c (15th ed.1993), noted that "[i]t is generally recognized that the interest allowed by § 506(b) will accrue until payment of the secured claim or until the effective date of the plan." See id. Accordingly, an oversecured creditor was entitled to preconfirmation interest on *124 arrearages paid off under the mortgagor's plan pursuant to § 506(b) and postconfirmation interest on such arrearages pursuant to § 1325(a)(5)(B)(ii).[13]
The Second Circuit in In re Valenti concluded that the market rate of interest under § 1325(a)(5)(B)(ii) "should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan," 105 F.3d at 64, but that "[b]ecause the rate on a treasury bond is virtually risk-free, the § 1325(a)(5)(B)(ii) interest rate should also include a premium to reflect the risk to the creditor in receiving deferred payments under the reorganization plan." Id. The court below, citing In re Dingley, approved a 9% present value interest rate with respect to Key Bank's claim in the case of the Harkos and an 8.5% present value interest rate in the case of the Milhams. In In re Dingley, the court held that the appropriate present value interest rate was the rate on United States Treasury instruments with maturity that best matches the proposed payout term on the allowed secured claim with the addition of up to 3% risk premium. See 189 B.R. at 271. In re Dingley was cited with approval by the Valenti court and its holding is squarely within In re Valenti. Furthermore, Key Bank has not taken issue with the court below's assessment of the appropriate present value interest rate: its arguments are directed solely against the award of present value interest as opposed to § 506(b) interest post-confirmation. Accordingly, the decision appealed from is hereby AFFIRMED.
MICHAEL J. KAPLAN, Bankruptcy Judge, concurring in part and dissenting in part.
The majority is transfixed by facially glossy jurisprudence that evolved principally in Chapter 11 cases and that truly applies only to undersecured claims. The notion of "present value" as it arises under Bankruptcy Code sections such as §§ 1325(a)(5) and 1129(b)(2)(A)(i)(II) derives exclusively from consequences of deferral of payments, i.e., a dollar tomorrow is worth less than a dollar today.[1] "Present value" is not implicated if I bargained for a dollar to be paid tomorrow, and if a plan promises precisely that  to pay a full dollar tomorrow. This is one of the differences between the notion of "present value" and the notion of "interest." Interest may be applicable even when "present value" is irrelevant. If a payment is not being deferred to a time beyond when it was due, there is no reason to consider "present value" in any sense, let alone the § 1325(a)(5)(B)(ii) sense. In more concrete terms, if the principal balance of an oversecured car loan will be paid off over more or less the same duration as the remaining duration of the original contract, and if it will be paid off by monthly payments that retire the debt over the approximate life of the remainder of the original contract duration, and at about the same risk level, then there is no need whatsoever to consider § 1325(a)(5)(B)(ii). Whatever rate of interest is ordered, it will be kept current on a monthly basis. The only issue remaining to be decided is what "profit" to award the oversecured creditor. In my view, that is where 11 U.S.C. §§ 506(b) and 1325(a)(1)[2] report front and center because *125 § 1322(b)(2)[3] cannot be read as permitting a debtor to modify a creditor's § 506(b) statutory right out of existence.
It is well-settled that oversecured claims and undersecured claims are treated differently under the Code. Indeed, § 506(b) was only one aspect of Congress's plan, in 1978, to clear up uncertainty surrounding treatment of secured claims in bankruptcy.[4] 11 U.S.C. § 506(b) commands "interest" (which is to say "profit"[5]) on oversecured debts.[6] In the case of United Savings Assoc. v. Timbers of Inwood Forest Assoc. (In re Timbers Inwood Forest Assoc.), 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court, among other holdings, made it clear that there is to be no postpetition "interest" (which is to say postpetition "profit") on undersecured loans. In the case of United States v. Ron Pair Enters., 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Supreme Court stated that the clear language of § 506(b) is such as to apply to all oversecured claims, whether the lien is consensual or nonconsensual. The creditors here are oversecured, not undersecured and so § 506(b) clearly applies. (Indeed, the practice of permitting some secured claims to be paid "outside the plan" at contract rate has never been questioned, e.g., payments on a mobile home.)
Further, 11 U.S.C. § 1325(a)(1) commands compliance with "all applicable provisions" of the Bankruptcy Code. Clearly, 11 U.S.C. § 506(b) is an "applicable provision." If the Chapter 13 Plans at issue do not defer the car payments past the dates originally due, then 11 U.S.C. § 1325(a)(5)(B)(ii) is irrelevant and offers no shelter from § 506(b).

DISCUSSION
Rarely is a lien on personalty oversecured in a Chapter 13 case.[7] Consequently, nearly all of the gloss on § 1325(a)(5)(B)(ii) has derived from consideration of claims that are undersecured, rather than oversecured. To be sure, we are bound by Rake v. Wade, 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), and GMAC v. Valenti (In re Valenti), 105 F.3d 55 (2d Cir.1997). However, neither the Supreme Court in Rake nor the Second Circuit in Valenti was asked to address the operation of § 506(b). In Rake the Supreme Court merely reiterated, without analyzing, the parties' understanding of the operation of § 506(b) as to an oversecured creditor, and in Valenti § 506(b) was not mentioned at all because the creditor was undersecured.
The analysis offered by the majority is brilliant (as are some of the authorities upon which it is based) as applied to a completely different case. It would speak ably to: (1) undersecured claims; (2) oversecured claims that are being significantly stretched out to a point at which application of the contract rate would provide the lender with a windfall at the expense of unsecured creditors, relative to the possible yield to the creditor if the loan were fully repaid by the end of the note duration; or (3) a significant reduction in risk to the lender. But where, as here (perhaps[8]), the only effect of the plan is to *126 reduce the oversecured creditors' profit, the high-sounding rationales of the majority's analysis lack substance. The majority has decided to accept a hand-me-down of the Emperor's new clothes. Following such rationales, the majority writes 506(b) (an "interest" provision) out of the Code at the point that § 1325(a)(5)(B)(ii) (a "present value" provision) comes into play.
The majority claims to find its authority in 11 U.S.C. § 1322(b)(2). Although this writer agrees with the majority's observation that Nobelman v. American Savings Bank, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), does not require that a distinction be observed between contract rights and statutory rights for § 1322(b)(2) purposes it seems to this writer that such a distinction is so clearly commanded by a common sense interpretation of the statute that Nobelman's recitation only of contract rights in discussing rights modifiable under § 1322(b)(2) seems simply to state a truth premised in intuition. For Congress to grant a right to oversecured creditors that the debtor may unilaterally expunge is too bizarre a notion for the majority to rest upon. Yet it seeks to do just that.
By what authority did the court in the case of In re Smith, 178 B.R. 946 (Bankr.D.Vt. 1995), cited by the majority, conclude that bankruptcy courts "do not award profit, administration costs, risk, industry transactional costs, costs of collection, and all those other myriad elements that go into a contract rate?" No authority was cited for writing § 506(b) out of the Code in such a manner. Why did the court in that case fail to tell us whether the oversecured creditor was being stretched out or not? It is because that and other courts, which I greatly admire and respect, likely were not presented with the right argument. The key argument as to why § 506(b) should be applied as written is this  "Why not?" It is statute; it is plain; and it deals with "interest" while § 1325(a)(5)(B)(ii) deals with "present value," which is a different subject. This writer sees no sound basis upon which to write § 506(b) and § 1325(a)(1) out of the Code at the point of confirmation. The majority fails to address the fact that the first requirement for confirmation of a Chapter 13 plan is that the plan "compl[y] with the provisions of [the Bankruptcy Code]," 11 U.S.C. § 1325(a)(1), one of those provisions being § 506(b).
Courts addressing this issue have largely addressed policy reasons, as if the statute admitted of such an approach. In any event, let us address those on the merits. Firstly, there is the argument that the reasoning of this dissenting opinion would disrupt Chapters 11. Lawyers are used to negotiating a "fair and equitable" interest rate for payment of secured claims in that chapter. See 11 U.S.C. § 1129(b)(2)(A)(i)(I). When negotiation fails, there is resort to the scholarship contained in an enormous body of cases and articles.[9] There seems to be concern that applying § 506(b) as written will disrupt the mystique that surrounds that process. This dissenting voice, it is submitted, adds only a wrinkle in the fabric of Chapter 11 debtor rehabilitation. The august body of scholarship remains completely applicable to undersecured claims. But, unless a completely oversecured creditor[10] otherwise agrees, such a creditor in Chapter 11 must be paid in full, and to pay that creditor at less than contract rate is, in Chapter 11 terms, to "impair" the creditor. An impaired, completely oversecured, nonconsenting creditor will always have certain preemptive rights over a Chapter 11 reorganization effort (and even over an orderly liquidation effort within Chapter 11). Therefore, the only practical effect that the present view would likely have if applied to a Chapter 11 case would be to extend the life of some plans or otherwise modestly enhance such a creditor's already-dominant power.[11]
*127 Furthermore, the differences between Chapters 11 and 13 are far weightier than the similarities. For example, there is no "projected disposable income test" in Chapter 11 thus the dramatic impact of a higher interest rate on Chapter 13 debtors is not necessarily so dramatic in Chapter 11. Also, Chapter 11 plans have no time limit, and can deal with a long-term obligation by means of a long-term plan, whereas long-term obligations in a Chapter 13 case must be dealt with by "maintaining" payments outside the plan at the contract rate of interest even as to undersecured claims, unless the debtor can somehow afford to pay the long-term obligation off during the life of the Chapter 13 plan. Chapter 11 is a great deal more flexible than Chapter 13. Chapter 11 policy, in sum, should not control the present question, even if the statute were not so clear.
Next, it is often argued that to grant postpetition interest at the contract rate to an oversecured creditor would be "unfair" to unsecured creditors. So long as an unconscionable rate of interest is avoided (see discussion below) then I believe that the "fairness" issue was settled against unsecured creditors a very long time ago. Surely in a Chapter 7 case, contract interest will be paid from the proceeds of sale of underencumbered collateral, no matter how much time lapsed between the petition date and the sale. If there is some reason to assess a § 506(c) charge against the secured creditor, that charge surely would be applied against a computation that permits interest to have accrued at the contract rate. Furthermore, we know that contract rate would be allowed outside bankruptcy. Truly, at least since the adoption of the Uniform Commercial Code by most states in the 1960's, the policy decision to benefit completely secured creditors at the expense of unsecured creditors has been unequivocal.
Moreover, the "fairness" issue was specifically addressed in the Timbers of Inwood case, wherein the United States Supreme Court recognized the pre-Code rule that "[i]t was considered unfair to allow an undersecured creditor to recover interest from the estate's unencumbered assets before unsecured creditors had recovered any principal." Timbers of Inwood, 484 U.S. at 373, 108 S.Ct. at 631 (emphasis added). The Court held that § 506(b) was enacted to codify that result; undersecured creditors are not to receive postpetition interest. However, the Court noted, § 506(b) "permits postpetition interest to be paid only out of the `security cushion.'" Id Clearly, the Supreme Court did not perceive that Congress saw anything "unfair" in awarding contract interest to an oversecured creditor, at unsecured creditors' expense, so long as it was paid out of an equity cushion.
Recently, the High Court observed, in the case of Associates Commercial Corp. v. Rash, ___ U.S. ___, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), that "from the creditor's perspective as well as the debtor's, surrender and retention are not equivalent acts." Rash, ___ U.S. at ___, 117 S.Ct. at 1885. It seems to the present writer that when a debtor seeks relief under a rehabilitative chapter of the Code, and elects to retain collateral, the result is not unlike a nonbankruptcy context in which the debtor hides the vehicle from the lienor and thereby thwarts repossession and sale. Can we doubt, in such context, that the unpaid balance continues to accrue interest at the contract rate until the creditor ultimately locates and obtains possession of the vehicle, and sells it?
As to grossly unfair rates of interest, this writer submits that Ron Pair (wherein it was held that interest is allowed even to noncontractual liens because the placement of punctuation marks in § 506(b) divorces the allowability of interest from the necessity of an agreement) stands for the proposition, by extension, that the interest that must be allowed to oversecured contractual liens is not necessarily the contract rate of interest. Rather, it seems that the rate of § 506(b) interest is committed to the sound discretion of courts, and the contract rate may or may not be applied. If the contract rate is grossly inequitable or would defeat the salutary purposes of the Code, then pursuant to Ron Pair, courts may select a lesser rate that *128 grants an element of profit that is fair under the circumstances, perhaps to be set in reference to market rates of some pertinent sort.
In sum, then, in light of history, the Chapter 7 result, the § 506(c) result, the nonbankruptcy result, and the ability to temper unconscionability within the confines of § 506(b), the "fairness" rationale for the majority's decision is not worthy.
Finally, many commentators have focused on the ways in which the state law rights of oversecured creditors are similar to the state law rights of undersecured creditors, in determining that they should be treated alike after confirmation. For example, it is true that each is compelled to sell the vehicle in a commercially reasonable manner after repossession. The present writer believes that the key regard in which the state law rights of the two are dissimilar has been ignored. Denying oversecured creditors the bargained-for rate not only "sticks" them with the equivalent of a money judgment (rather than cash) on the day of confirmation, but it treats the added value in the collateral as if it no longer exists. We all understand why it suffices to give an undersecured creditor only the present value of the car; the most that that creditor would get if it got the car back would be cash today equaling the value of the car. So the substitute of cash over time at present value under § 1325(a)(5)(B)(ii) works fine with undersecured claims. But an oversecured creditor, by definition, is a creditor who (were it not for the bankruptcy) would have the opportunity to bid in at sale, and if no one else recognizes the true value of the vehicle (not such a big "if," in point of fact, if (for example) the lender is itself a used car dealer who does not send the repo out to open auction), the creditor could acquire title for the upset price, and resell the vehicle at a profit. Hence, while the "most" that an undersecured creditor could obtain is a portion of the debt, the "most" that an oversecured creditor could obtain outside bankruptcy is the full amount of the debt, plus the excess value in the collateral. That is precisely what was bargained for by an oversecured creditor (particularly one who is a true purchase-money seller/lender), and what an undersecured creditor failed to obtain.
What has happened to that excess value in a Chapter 13 case? What happened to the value that the creditor bargained for as security for her profit on the loan? Under the majority's decision, that excess value has been converted to the debtor's benefit in the form of a $2400 state law exemption that the debtor would not enjoy outside Chapter 13 if the car only fetched the liened amount at a "commercially reasonable sale." Furthermore, under the majority's decision, any value over that liened amount plus the exemption has been converted to the benefit of unsecured creditors by virtue of the Chapter 7 test.
In this writer's view the Code is not susceptible of such a larcenous result. Particularly not when all the authority for that result is in derogation of § 506(b) and § 1325(a)(1) and is based only on either a misreading of Rake v. Wade, or on analyses that have facial appeal, but hold up to close scrutiny only in the context of undersecured claims. Indeed, in Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the Supreme Court stated that any postpetition increase in value of overencumbered collateral in a Chapter 7 case belongs to the lienor, not to the debtor or her creditors. To me, this hints that the same should be true of the excess value of underencumbered property in Chapter 13, until the debt is paid in full, profit and all.
Perhaps most importantly, we must not forget what Congress said when it overturned the ruling of Rake v. Wade in 1994, by enacting § 1322(e) and its Chapter 11 and 12 counterparts. The Supreme Court in Rake v. Wade had held that "present value" payments must be made even on the portion of prepetition mortgage arrears that were interest arrears despite the fact that state law prohibited payment of "interest on interest." Congress desired to make state law preeminent in that regard. When it did so, the pertinent Congressional Committee stated in the legislative history that the purpose of the amendment was to "limit the secured creditor to the benefit of the initial bargain with no court contrived windfall. It is the *129 Committee's intention that a cure pursuant to a plan should operate to put the Debtor in the same position as if the default had never occurred." 140 Cong. Rec. H10770 (daily ed. Oct. 4, 1994) (emphasis added).
The specific language of § 1322(e) is this: "Notwithstanding subsection (b)(2) of this section and sections 506(b) and 1325(a)(5) of this title, if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1322(e). The majority's explanation of how Congress could have intended prepetition arrears to be cured at the contract rate (unless that would constitute "interest on interest"[12] that would violate state law), but intended that unmatured future payments be paid at a rate that denies the creditor the "benefit of its initial bargain" is unpersuasive. Also unpersuasive is the majority's explanation of how its result is compatible with the fact that "maintenance" of payments outside the plan on long-term debts under § 1322(b)(5) must be at the contract rate of interest even if the creditor is undersecured rather than oversecured. Certainly, Congress could not have intended that § 506(b) and § 1325(a)(1) be written out of the Code at the point of confirmation by virtue of the mere fact that the remaining duration of the loan is less than the length of the debtor's proposed plan. (Long-term mobile home payments, for example, are routinely "maintained" outside the plan, at contract rate.) It is for these reasons that this writer believes that in general, the discretion of the court should be applied in favor of the contract rate.

CAVEAT
All of this being said, this minority decision dissents only In part because the Panel has not been told whether the interest rate is the only term that the Debtors seek to modify. It is important to know whether award of the contract rate will simply assure the oversecured creditor of the bargained-for profit, or whether it will provide to the creditor a true windfall at unsecured creditors expense.
Consider an illustration. I loaned you $10,000 to buy a $30,000 vehicle at 15% for three years. In the third year, when the vehicle is worth, say, $ 15,000 and you owe me perhaps $7,000,[13] you file Chapter 13 and propose to stretch the last year's payments out over five more years. If such were the case, an award of 15% might be a windfall to me, over and above the bargained-for profit. It would be a windfall if, as of the date of confirmation, markets had dropped to the point at which there were no way that I could obtain anything approaching a 15% yield on a five year investment of monies equal to what I would receive on the remaining payments on the car loan according to the original terms, if I were to invest each of those payments.
Were this a two-party dispute only, this writer would have no difficulty imposing the 15% rate on the debtor who elects to stretch out the remainder of the payments over the lender's objection. Indeed a failure to do so probably would invite abuse of Chapter 13. I would not, however, impose a windfall rate at the expense of the debtor's other creditors.[14] If, in fact, market rates of interest had dropped substantially, it is at the point that applying the contract rate to a stretch-out would yield a windfall, that I would pay heed to the majority's decision and the authorities upon which it claims to be based.
I am not suggesting that under those circumstances the contract rate should apply until a specified date during the life of the plan, and then a different rate thereafter. Rather, a stretch-out, by definition, involves a deferral of payments, and reference to § 1325(a)(5)(B)(ii) is proper. As of the date of confirmation, the present value of what the *130 oversecured creditor will receive under the plan must not be less than the present value of what the creditor was to receive over the balance of the original contract.[15] That, in this context, is what is meant by § 506(b), § 1325(a)(1), and § 1325(a)(5)(B)(ii) when read in pari materia. If a fair rate of interest (a fair rate of profit) is fully paid on a monthly basis in a Chapter 13 plan, the argument that this analysis requires payment of interest on unmatured interest is entirely baseless.
Where there is, in fact, deferment the simplest way to address the complex functions invoked by this writer's analysis is to negotiate and settle them. Indeed that is the way that nearly all cases that involve the present fact pattern are resolved in all three of the rehabilitative chapters  Chapters 11, 12 and 13. (Perhaps in Chapter 9 as well. This writer has no experience with that Chapter.)
The rules of administrative convenience adopted by many courts for dealing with the present value issue as to undersecured claims are wholly appropriate, as affirmed by the Valenti decision, since the value of the undersecured claim is easy to measure; it is the value of the vehicle. As to oversecured claims, the value of the vehicle is not relevant. We must measure the value of what the creditor was to receive under the original contract. So rules of administrative convenience fail us. The difficulty in reaching the correct result as to oversecured claims where a substantial modification is sought other than merely as to interest rate, is precisely the reason that any dispute should be negotiated to settlement. The complexity, expenses, and uncertainty of litigating the "present value" of what a particular stretched-out oversecured creditor will receive under a plan, as compared to the present value of what that creditor was to receive over the balance of the original term of that contract, should cause one to shy away from the effort, and cause one to seek a settlement instead. (Over a mere three to five year period, the "swing" in possible rates would likely be offset by the cost of the proof.)

CONCLUSION
As stated at the outset of this minority opinion, if the principal balance of an oversecured car loan will be paid off over more or less the same duration as the remaining contract duration, and if it will be paid off by monthly payments that keep the interest current and retire the debt over the life of the remaining duration of the original contract, and if it will be paid at about the same risk, then no reference to § 1325(a)(5)(B)(ii) is necessary because there are no "deferred payments." Section 506(b) should be viewed as requiring that the creditor be left unimpaired unless it agrees to the impairment or unless the contract rate is unconscionable, in which latter event it may be mitigated pursuant to Ron Pair. To fail in this is to appropriate to others the excess value that the secured creditor bargained for and that would surely be available to secure the creditor's profit if the debtor simply hid the collateral for three to five years in a storage shed rather than "hiding" it here, under the shelter of the court.
For all of the above reasons, I would remand for further proceedings. If the plan provisions for payment of the oversecured creditor in these two cases are not very different from the original loan terms, I would direct an award of the contract rate. If there are other significant differences (stretch out, changed use, etc.) and if contract rate would result in a windfall at the expense of someone other than the Debtors, I would direct that the rate be tempered by the bankruptcy court's discretion, and only a "fair" profit be reflected in the awarded § 506(b) rate. On the other hand, if there are other significant differences and the contract rate would leave the creditor with less (at present value) than what the present value rate would yield to that creditor, then something closer to what some commentators have referred to as a "forced loan" rate[16] *131 should be negotiated, under § 1325(a)(5)(B)(ii), even though higher than contract rate.
NOTES
[1] Section 502(b)(2) reads, in relevant part: "[I]f [an] objection to a claim is made, the court . . . shall allow such claim in such amount, except to the extent that . . . such claim is for unmatured interest[.]"
[2] The first sentence of § 506(a) provides for the bifurcation of an undersecured claim into separate and independent secured claim and unsecured claim components. It provides in relevant part:

An allowed claim of a creditor secured by a lien . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.
The second sentence of § 506(a) provides guidelines for the valuation contemplated by the first sentence. It provides:
Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
[3] Following the Supreme Court's holding in U.S. v. Ron Pair Enterprises, Inc., 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) that the phrase "provided for under the agreement under which such claims arose" does not qualify "interest on such claim," it is clear that § 506(b) does not mandate that the rate of interest to which the oversecured creditor is entitled postpetition is the contractual rate. Such rate is in the discretion of the court. See In re DeMaggio, 175 B.R. 144, 148 (Bankr.D.N.H.1994). However, courts habitually award contractual interest.
[4] But cf. In re Smith, 178 B.R. 946, 951 (Bankr. D.Vt.1995) in which the court noted:

[I]nterest accruing on a loan prepetition is part of the claim in bankruptcy. The Code, however, does not provide for postpetition interest as part of the claim; rather, in some circumstances, it provides for interest on the claim.
[5] As Dean Pawlowic has pointed out:

[F]rom a policy viewpoint, it would make sense to treat pendency interest as part of the secured claim for purposes of plan interest, because pendency interest is a substantive right granted under the Code which would be subject to dilution if payable on a preferred basis without a present value requirement. Dean Pawlowic, Entitlement to Interest under the Bankruptcy Code, 12 Bankr.Dev. J. 149, 171-2.
[6] The method of valuation of collateral under § 506(a) adopted in In re Valenti has been criticized by the Supreme Court. See Associates Commercial Corporation v. Rash, ___ U.S. ___, ___-___, 117 S.Ct. 1879, 1886-87, 138 L.Ed.2d 148 (1997). However, Rash does not address "present value interest," the subject of this decision.
[7] As noted by a number of courts, during the legislative process leading to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress specifically considered an amendment requiring the contract rate of interest to be paid under § 1325(a)(5)(B)(ii) and rejected it. H.R. 1085, 98th Cong., 1st Sess. § 19(2)(A) (1983); H.R. 1169, 98th Cong., 1st Sess. § 19(2)(A) (1983); H.R. 4786, 97th Cong., § 19(2)(A) (1981); see also Green Tree Financial Servicing Corp. v. Smithwick, 202 B.R. 420, 423 (S.D.Texas.1996); In re Collins, 167 B.R. 842, 845 n. 4 (Bankr.E.D.Tex.1994); Matter of Richards, 106 B.R. 762, 765 (Bankr.M.D.Ga.1989).
[8] Section 1322(b) provides in relevant part:

(b) . . . the plan may 
. . .
(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; . . .
11 U.S.C. § 1322(b).
[9] For a helpful summary of the legislative history of § 1322(b)(2), see In re Bellamy, 962 F.2d at 181-2. The Second Circuit concluded:

Quite obviously the final version of § 1322(b)(2) represented a compromise. The legislative history therefore indicates only that § 1322(b)(2) was designed to provide greater protection to home mortgage lenders than other secured creditors in the Chapter 13 context.
[10] We would have to agree, in the light of Ron Pair and Rake v. Wade that § 506(b) confers rights to interest which are not necessarily contractually based. See further n. 3, supra.
[11] In the context of an undersecured home mortgage, Chapter 13 debtors argued that the protection afforded by the "other than" exception in § 1322(b)(2) applied only to the extent the mortgagee held a secured claim in the debtor's home and did not prohibit alteration of such mortgagee's rights as to the unsecured portion of its claim. The Supreme Court rejected the argument holding that the mortgagee's rights were not limited by the valuation of its secured claim. The term "claim" in the "other than" clause refers to the lienholders entire claim, both secured and unsecured portions and it is the mortgagee's rights with respect to the entire claim that may not be modified.
[12] A minority of courts have characterized the relationship between § 506(b) and § 1325(a)(5)(B)(ii) in a different fashion. For example, in Koopmans v. Farm Credit Services of Mid-America, ACA, 102 F.3d 874 (7th Cir.1996), the Court of Appeals for the Seventh Circuit addressed the applicable interest rate in the case of an oversecured loan in a Chapter 12 cramdown. Having stated that the creditor was oversecured and entitled to interest pursuant to § 506(b), the court then posed itself the question, "at what rate?" The court answered the question by reference to § 1225(a)(5)(B)(ii), holding that the secured creditor was entitled to the "indubitable equivalence" of its property interest "which means a stream of payments including interest that adds up to the present value of its claim." Id. at 874. In re Anderson, 28 B.R. 628 (S.D.Ohio.1982) held that § 506(b) "is incorporated by reference into Section 1325(a)(1), so that the bankruptcy court may not confirm a plan which fails to provide interest for eligible creditors." Nevertheless, the court found that the appropriate post-confirmation interest rate under § 506(b) to be the rate prescribed by Ohio law rather than the interest rate specified by the mortgage in question. We cannot agree with these analyses. Further, in dicta in In re Smith, 4 B.R. 12 (Bankr.E.D.N.Y.1980) the court appeared to suggest that an oversecured creditor could receive § 506(b) interest in addition to present value. Id. at 13. We disagree.
[13] Rake v. Wade was effectively overruled by changes made by the Bankruptcy Reform Act of 1994 which added §§ 1123(d), 1222(d) and 1322(e). Pub.L. No 103-394 (enacted on Oct. 22, 1994).
[1] Unlike oversecured claims, "present value" is relevant as to undersecured claims that will not be paid in full under a plan. It is relevant because some of the dollars that originally were promised to be paid "tomorrow" are never going to be paid: The lender's claim is being "stripped-down" to the value of the vehicle and the unsecured deficiency will be paid less than in full. Discharge of the unpaid portion is the ultimate "deferral." It is therefore important to make certain that what the creditor will receive on account of the secured claim is not of less value than the replacement value today. See Associates Commercial Corp. v. Rash, ___ U.S. ___, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).
[2] Section 1325(a)(1) provides that, "the court shall confirm a plan if . . . the plan complies with the provisions of this chapter and with the other applicable provisions of this title . . ." 11 U.S.C. § 1325(a)(1). The first confirmation requirement, therefore, is that the plan comply with, among many other provisions, § 506(b).
[3] Section 1322(b)(2) reads as follows: "[T]he [Chapter 13] plan may . . . modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims . . ." 11 U.S.C. § 1322(b)(2).
[4] See, e.g., H.R.Rep. No. 95-595, at 180-81 (1977) U.S.Code Cong. & Admin.News 1977, at 5787, 6140-41, reprinted in Appendix 2 Collier on Bankruptcy, pt. II (Lawrence P. King, ed., 15th ed.1996).
[5] Any effort to define contract interest as anything other than profit might be technically accurate, but pragmatically wasted. That profit is the key element of interest seems too obvious to belabor.
[6] Although there may be true technical differences between oversecured "debts," as distinct from oversecured "creditors" or oversecured "claims," etc., I disagree with the courts and commentators who believe the distinctions to have relevance in the present context, as will be explained herein. Thus, this minority decision will use the terms interchangeably.
[7] Some would argue that if there is equity in a car, the car salesperson goofed: With that large a downpayment, some have said that she should have talked the buyer into a more expensive car.
[8] We do not have enough information here to determine whether and to what extent the oversecured creditors are being stretched out. Hence this opinion concurs in part and dissents in part.
[9] In 1995, the Smith case noted thirty-five articles on the subject. See Smith, 178 B.R. at 949 n. 6.
[10] "Completely oversecured" here means sufficiently oversecured that the limitation contained in § 506(b) will not be reached.
[11] Specifically, the effect that an application of this dissent's analysis to Chapter 11 would have is to "ratchet-up" the rate to be paid to an oversecured creditor. Unquestionably, that is no small "item" in a big case. Millions of dollars might be implicated in a mega case, but that will typically mean a more extended plan, and not the difference between reorganizability and non-reorganizability, with very rare exceptions. In a liquidating case, the running of the interest "clock" always commands swiftness, and a higher rate will simply command greater swiftness.
[12] Again, as stated at the outset, a plan that promises payments that parallel the original note's amortization rate involves no deferral of payments and does not implicate § 1325(a)(5) at all. Hence, the majority's unsupported insistence that this writer's analysis results in "interest on unmatured interest" is specious.
[13] I have not done the amortization computations.
[14] Often there would be no loss to other creditors. The plan simply would be extended, not to exceed five years.
[15] Some will take issue with this formulation. See supra note 6.
[16] Although the notion of a "forced loan" rate has been criticized because of the absence of a lender market, the Valenti decision permits the court to make an adjustment for "risk" that might, for example, foretell approval of an approach that adds a risk factor to market rate to produce a forced loan rate.