**In re Ralph J. VALENTI and Mary Phyllis Valenti, Debtors.**

**GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff–Appellant,**

v.

**Ralph J. VALENTI and Mary Phyllis Valenti, Defendants–Appellees,**

and

**Andrea E. Celli, Esq., Chapter 13 Trustee, Trustee–Appellee.**

No. 1422, Docket 95–5079.

United States Court of Appeals, Second Circuit.

Argued May 8, 1996.

Decided Jan. 15, 1997.

57

David G. Epstein, Atlanta, GA (Mark M. Maloney, King & Spalding, Atlanta, GA, of counsel, Rudolph J. Meola, Richard J. Miller & Associates, P.C., on the brief), for Plaintiff–Appellant.

Michael J. O'Connor, Albany, N.Y. (Cynthia A. Platt, O'Connor, O'Connor, Mayber-

ger & First, P.C., Albany, NY, of counsel) for Defendants–Appellees.

Andrea E. Celli, Albany, NY, Chapter 13 Standing Trustee.

(Kenneth R. Hiller, Law Office of Jeffrey M. Freedman, Buffalo, NY, of counsel, and on the brief), for Amicus Curiae The National Association of Consumer Bankruptcy Attorneys, Inc.

(Jonathan D. Deily, Susan S. Dautel, and Martin A. Mooney, Deily, Testa & Dautel, L.L.P., of counsel, and on the brief), for Amicus Curiae Chrysler Financial Corporation, Ford Motor Credit Company and Toyota Motor Credit Corporation.

Before: CARDAMONE, ALTIMARI, and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Appellant General Motors Acceptance Corporation ("GMAC") appeals from the judgment of the United States District Court for the Northern District of New York (Con. G. Cholakis, *Judge*), which upheld the bankruptcy court's confirmation of the Chapter 13 reorganization plan of debtors-appellees Ralph and Mary Valenti. There are two issues on appeal: (1) whether the district court erred when it upheld the valuation of the Valentis' automobile under 11 U.S.C. § 506(a) based upon the average of the wholesale and retail values of the car; and (2) whether the district court erred when it determined that the present value of GMAC's claim under 11 U.S.C. § 1325(a)(5)(B)(ii) was properly based upon the market rate of interest GMAC paid for the funds it borrowed at the time of confirmation of the Valentis' reorganization plan. We affirm the district court on the issue of valuation. With respect to the applicable interest rate, we vacate the district court's holding and remand for a recalculation of that rate based upon the treasury rate plus an additional risk premium.

## I. BACKGROUND

In April 1993, the Valentis purchased a 1990 Pontiac Bonneville. To purchase the car, the Valentis borrowed money from GMAC. GMAC secured the loan by retaining a lien on the car. In December 1994, the Valentis filed for bankruptcy under Chapter 13 of the Bankruptcy Code.

Chapter 13 gives individual debtors an alternative to total liquidation (which occurs under Chapter 7). Chapter 13 bankruptcy, which is only available to debtors with income, effects a reorganization of the debtor's debts and establishes a plan of repayment to creditors, giving the debtor a fresh start at the end.

Chapter 13 removes the secured creditor's right to repossess and foreclose on its security interest. Instead, Chapter 13 gives the debtor the option of either surrendering the property to the secured creditor, or maintaining possession of the property. *See* 11 U.S.C. § 1325(a)(5)(B)–(C). When the debtor opts to maintain possession of the collateral, the creditor keeps its security interest in the collateral. In addition, the debtor's reorganization plan must provide for payments to the creditor totalling no less than the present value of the creditor's allowed claim. *See* 11 U.S.C. § 1325(a)(5)(B). Where, as here, the reorganization plan is confirmed over the creditor's objections, the plan is colloquially referred to as a "cramdown."

The Valentis opted to keep their car. The bankruptcy court valued the car at $6700, the average of the wholesale and retail values of the car. In so valuing the car, the bankruptcy court followed Northern District of New York Local Bankruptcy Rule 312(b) ("Local Rule 312(b)"), which states in relevant part:

> Unless otherwise determined by the court, valuation of motor vehicles shall be the average of trade-in and retail values, including options and mileage, as contained in the Eastern Edition of the N.A.D.A. Official Used Car Guide for the month the debtor's petition was filed.

The bankruptcy court also identified an interest rate of nine percent to compensate GMAC for the fact that it would be receiving the value of its claim over a period of time.

GMAC raised two objections to the Valentis' reorganization plan. First, GMAC argued that the car should have been valued at its retail price, which the parties agreed was

$7850. Second, GMAC objected to the nine percent interest rate. According to GMAC, the correct interest rate was 15.7%, which was the rate that GMAC charged at the time of the plan's confirmation to consumers in the Valentis' geographic area.

The bankruptcy court rejected GMAC's objections. GMAC appealed to the district court, which affirmed the bankruptcy court on both issues. *General Motors Acceptance Corp. v. Valenti*, 191 B.R. 521 (N.D.N.Y. 1995) (Cholakis, J.). With respect to valuation, the district court found no error in the bankruptcy court's valuation of the car based on the average of its wholesale and retail prices. Rather, the district court found that use of this formula resulted in a value that "is within the range that can be 'determined in light of the purposes of the valuation and of the proposed disposition or use of such property.'" *Id.* at 522 (quoting 11 U.S.C. § 506(a)). As for the interest rate, the court held that the appropriate interest rate is the rate that GMAC pays for the funds it borrows, rather than the rate that it charges its own borrowers. Because it did not appear that the nine percent interest rate set by the bankruptcy court was beyond the range of what it might cost GMAC to borrow funds at the time of the confirmation of the Valentis' reorganization plan, the district court affirmed on that issue. *Id.*

GMAC brought this appeal.

## II. DISCUSSION

### 1. Standard of Review

■ The question before us being one of statutory interpretation, the standard of review is de novo. *Bellamy v. Federal Home Loan Mortgage Corp. (In re Bellamy)*, 962 F.2d 176, 178 (2d Cir.1992).

### 2. Relevant Code Provisions

■ Section 1325(a)(5)(B)–(C) of title 11 of the United States Code provides the circumstances under which a bankruptcy court may confirm a Chapter 13 debtor's reorganization plan. According to this statute:

(a) ... the court shall confirm a plan if—

. . . .

(5) with respect to each allowed secured claim provided for by the plan—

. . . .

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder.....

11 U.S.C. § 1325(a)(5). Thus, before a plan is confirmed, § 1325(a)(5)(B)–(C) requires one of two things to occur: either the creditor retains the lien on the collateral, and the plan provides for payments to the creditor that will compensate the creditor for the full value of the allowed secured claim, or the debtor gives up possession of the property securing the creditor's allowed claim.

■ If the debtor chooses to maintain possession of the secured collateral, as § 1325(a)(5)(B)(i)–(ii) allows the debtor to do, then the debtor must compensate the creditor for the full value of the allowed secured claim. To determine the value of the creditor's allowed secured claim, we turn to 11 U.S.C. § 506(a). Section 506(a) provides:

An allowed claim of a creditor secured by a lien ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.... Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Thus, according to § 506(a), it is the creditor's interest in the debtor's interest that is to be valued. In determining this value, the bankruptcy court must consider both the purpose of the valuation and the "proposed disposition or use" of the property. Beyond these rather amorphous guidelines, however, the statute is silent regarding whether retail price, wholesale price, or some other value should be assigned to the creditor's interest.

In addition, full payment under § 1325(a)(5)(B)(ii) requires that the creditor receive the "present value" of the allowed secured claim. As we explained in *In re Bellamy:*

> [F]ull payment under § 1325(a)(5)(B)(ii) includes interest on the amount presently owing; this "present value" element of § 1325 is necessary to compensate the creditor for its inability to use the money owed while payments under the plan are being made, thereby achieving full satisfaction of the secured debt.

962 F.2d at 185. Section 506(a) and § 1325(a)(5)(B)(ii) are both silent, however, regarding the interest rate that should apply to reflect the "present value" of the creditor's claim.

3. Value of the Car

At issue in this appeal is the value of the "allowed amount" of GMAC's claim. Because the Valentis opted to keep their car, rather than surrender it to GMAC, the terms of their Chapter 13 reorganization plan are governed by § 1325(a)(5)(B)(i)–(ii). Pursuant to that subsection, the Valentis' repayment plan must provide for payment to GMAC of an amount "not less than the *allowed amount of*" GMAC's claim. 11 U.S.C. § 1325(a)(5)(B)(ii) (emphasis added). The bankruptcy court based the value of GMAC's claim on the average of the retail and wholesale prices of the Valentis' automobile. GMAC objected to this method of valuation, arguing instead that the retail price of the automobile should serve as the basis for the valuation.

As was explained above, § 506(a) does not specify a particular value to be assigned to the creditor's allowed claim. To determine this value, therefore, we begin by examining the plain language of the sentences that comprise § 506(a). *See Patterson v. Shumate*, 504 U.S. 753, 757, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992).

The first sentence, which states that a secured creditor's claim is "allowed ... to the extent of the value of such creditor's interest in the estate's interest in such property," contemplates a two-step analysis.

First, we must ascertain the estate's, i.e., the debtor's,[1] interest in the property securing the creditor's lien. *See Associates Commercial Corp. v. Rash (In re Rash)*, 90 F.3d 1036, 1043 (5th Cir.1996) (in banc), *cert. granted,* —— U.S.. ——, 117 S.Ct. 758, 136 L.Ed.2d 694 (1997). In some instances, the debtor may not be the sole owner of the collateral, or the nature of the debtor's interest may be something other than an ownership interest, such as a leasehold interest. *See* 3 *Collier on Bankruptcy* ¶ 506.04, at 506–17 (Lawrence P. King et al. eds., 15th ed. 1996). In the instant case, however, the Valentis are the sole owners of their vehicle. Therefore, the phrase "estate's interest in such property" merely serves to designate the property in which the *creditor* has an interest; in this case, that property consists of a 1990 Pontiac Bonneville. *In re Maddox,* 200 B.R. 546, 552 (D.N.J.1996). Significantly, the words "estate's interest in such property" do not require a separate valuation of the estate's interest. *See In re Rash,* 90 F.3d at 1044.

Second, we must determine the creditor's interest in the collateral. *In re Rash,* 90 F.3d at 1043. When a Chapter 13 debtor chooses to maintain possession of the collateral, the creditor maintains his lien on that property. *See* 11 U.S.C. § 1325(a)(5)(B)(i). Therefore, the creditor's interest in the collateral is in the nature of a security interest. This security interest consists of the right to repossess and liquidate the collateral if the debtor defaults on the repayment plan. *See* 11 U.S.C. § 101(37), (51). Therefore, under a plain reading of the statute, it is this security interest—the right to repossess and liquidate the collateral— that § 506(a) directs courts to evaluate.[2]

---

1. Section 506(a) uses the word "estate" instead of the word "debtor" because the commencement of a bankruptcy action creates an estate. *See* 11 U.S.C. § 541(a). With certain exceptions provided for in the statute, the debtor's interest in property is transferred to the estate. *See* 11 U.S.C. § 541.

2. It is significant that § 506(a) focuses on the creditor's interest in property, as opposed to the debtor's interest in the same property. Through-

Were § 506(a) to end with the first sentence, it easily might be concluded that the value to be applied to a creditor's allowed claim should be fixed at the collateral's liquidation—or wholesale—value. *See, e.g., Rash,* 90 F.3d at 1044 ("Focusing on the creditor's potential recovery makes sense because the first sentence of § 506(a) refers to 'the value of such creditor's interest.'"). The inquiry, however, may not end at this point. The second sentence of § 506(a) sets forth two additional criteria that bankruptcy courts must consider. Specifically, this sentence directs the bankruptcy court to evaluate the creditor's interest: (1) "in light of the purpose of the valuation" and (2) "[in light] of the proposed disposition or use of such property."

At the outset, adding the "purpose of the valuation" into the § 506(a) analysis does not appear to alter the inclination to value the collateral based on its wholesale price. The purpose of the valuation is to identify the "allowed amount" of GMAC's claim. *See* 11 U.S.C. § 1325(a)(5)(B)(ii). Based on our interpretation of § 506(a) so far, we have determined that GMAC's claim is in the form of a security interest in the Valentis' automobile. Because a security interest represents the right to repossess and liquidate the collateral, evaluating the creditor's interest in the collateral "in light of the purpose of the valuation" once again leads to the conclusion that the value of the collateral should be fixed at its wholesale price.

This conclusion is no longer certain once we account for the "proposed disposition or use of such property." Rather, inclusion of

this second instruction in § 506(a) suggests that every valuation should reflect what it would cost the debtor to replace the collateral. *See* 3 *Collier on Bankruptcy* ¶ 506.04, at 506–30.

For example, the Valentis chose to maintain possession of their 1990 Pontiac Bonneville. A § 506(a) valuation is not necessary under § 1325(a)(5)(B)(ii) unless the debtor chooses to maintain possession of the collateral. To replace their car through a dealer, the Valentis most likely would have to pay retail price; the cost might be less if they could buy a comparable car directly from the prior owner. Whatever the exact replacement cost, however, the value of the creditor's allowed claim must account for the likely replacement cost of the Valentis' vehicle. This restrains bankruptcy courts from automatically designating the wholesale value as the value of a creditor's allowed claim. What remains unclear is what alternative value—if any—courts should automatically apply to a Chapter 13 creditor's allowed claim.

This Court certainly is not the first to be challenged with interpreting and applying the seemingly conflicting provisions of § 506(a). Various courts both within and without this Circuit have reached different conclusions with respect to the value that should be assigned to a creditor's allowed claim. Their decisions may roughly be grouped into three categories: those applying the collateral's wholesale value,[3] those applying the retail value,[4] and those using some amount in between wholesale and retail value.[5]

out the term of their financial relationship, the creditor's and debtor's financial interests are not necessarily on par. For example, while a creditor's interest in a vehicle is a security interest generally equal to the vehicle's wholesale value, a debtor often is willing to pay either fair market value or retail value for the luxury of owning a car.

**3.** *See, e.g., Associates Commercial Corp. v. Rash (In re Rash),* 90 F.3d 1036, 1060–61 (5th Cir. 1996) (in banc), *vacating Associates Commercial Corp. v. Rash (In re Rash),* 31 F.3d 325 (5th Cir.1994) ["*Rash I*"]; *In re Maddox,* 200 B.R. 546, 548 (D.N.J.1996); *In re Byington,* 197 B.R. 130, 139 (Bankr.D.Kan.1996).

**4.** *See, e.g., Winthrop Old Farm Nurseries, Inc. v. New Bedford Institution for Savings (In re Win-*

*throp Old Farm Nurseries, Inc.),* 50 F.3d 72 (1st Cir.1995) (relying on *Rash I*); *Metrobank v. Trimble (In re Trimble),* 50 F.3d 530 (8th Cir. 1995) (relying on *Rash I*); *Huntington Nat'l Bank v. Pees (In re McClurkin),* 31 F.3d 401 (6th Cir.1994); *Brown and Co. Sec. Corp. v. Balbus (In re Balbus),* 933 F.2d 246 (4th Cir.1991); *In re Green,* 151 B.R. 501, 504 (Bankr.D.Minn.1993); *cf. Arnette v. General Motors Acceptance Corp. (In re Arnette),* 156 B.R. 366, 367–68 (Bankr.D.Conn. 1993) (holding that vehicle should be valued at fair market value, which the court found to be equal to the N.A.D.A. retail value).

**5.** *See, e.g., Taffi v. United States (In re Taffi),* 96 F.3d 1190, 1193 (9th Cir.1996) (in banc) (basing a valuation under § 506(a) on the collateral's fair market value as that value is "determined by the

Most courts applying retail value reason that the retail value most closely represents what it would cost the debtor to replace the collateral. This ignores the possibility that the debtor could replace the vehicle at a cost below retail by purchasing another car "as is" from a non-dealer. In addition, the debtor's car may have infirmities that would reduce its value below the retail price. The retail price includes not only a vehicle, but also dealer clean-up and fix-up costs, a dealer profit margin, and warranty. Therefore, fixing a vehicle's value under § 506(a) at retail may well compensate the creditor beyond the actual value of that creditor's collateral. In many cases, valuing a car at retail would be the same as reaffirming the debtor's original obligation. *See In re Hoskins,* 183 B.R. 166, 170 (Bankr.S.D.Ind.1995), *aff'd,* 102 F.3d 311 (7th Cir.1996). Furthermore, using retail value alone ignores the fact that the *creditor's interest,* i.e., liquidation or wholesale value, must be taken into account as we have discussed earlier.

We believe the correct result is that no fixed value, whether it be retail, wholesale, or some combination of the two, should be imposed on every bankruptcy court conducting a § 506(a) valuation. None of these values would accurately reflect the value of the collateral in every Chapter 13 cramdown. *See Dewsnup v. Timm,* 502 U.S. 410, 416, 112 S.Ct. 773, 777–78, 116 L.Ed.2d 903 (1992) (noting the difficulty of interpreting ambiguous provisions of § 506 in a single opinion applicable to all possible situations). Therefore, as long as bankruptcy courts consider both the purpose of the valuation and the proposed use and disposition of the property, we believe that they have satisfied the requirements of § 506(a).

Moreover, the language of § 506(a) describes a flexible standard. As the legislative history to § 506(a) explains: "'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts [must] . . . determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." H.R.Rep. No. 95–595, at 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6312; *see Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984) (explaining that where statutory language is ambiguous, courts ascertain the statute's meaning by looking to legislative history). Forcing bankruptcy judges to weigh either of the statute's dual considerations more heavily than the other regardless of the circumstances renders one of those considerations inoperative. *See United States v. Nordic Village, Inc.* 503 U.S. 30, 35–36, 112 S.Ct. 1011, 1015–16, 117 L.Ed.2d 181 (1992) (noting rule that statutes must be interpreted to avoid rendering any part inoperative).

This outcome purposely leaves some degree of discretion in the hands of bankruptcy judges to shape proceedings in the way they see fit. For example, it allows bankruptcy judges to ensure that equity among competing creditors is maintained and that a creditor is not taking advantage of a debtor's inability to replace secured property. Furthermore, this outcome insulates decisions of the bankruptcy courts from constant challenge, and it defers to local rules and state laws related to valuation. *Cf. In re Rash,* 90 F.3d at 1047, 1060.

Thus, we hold that a bankruptcy court is required to consider two criteria in every § 506(a) valuation: (1) the purpose of the valuation, and (2) the proposed disposition and use of the collateral. It is irrelevant what starting point the court uses to reach the ultimate value of the claim at issue before it, as long as the final valuation of that claim reflects § 506(a)'s dual considerations.

█ Under this analysis, the Local Rule applied by the bankruptcy judge in the instant case provides a good guidepost. Local Rule 312(b), which was developed specifically for the purpose of determining the value of motor vehicles in Chapter 13 cases, implicitly accounts for the dual considerations con-

facts presented to the bankruptcy court"); *Johnson v. General Motors Acceptance Corp. (In re Johnson),* 165 B.R. 524, 528–30 (S.D.Ga.1994) (fair market value); *In re Madison,* 186 B.R. 182,

184 (Bankr.E.D.Pa.1995) (average of retail and wholesale values); *In re Myers,* 178 B.R. 518, 524 (Bankr.W.D.Okla.1995) (same).

tained in § 506(a) by taking the average of the vehicle's wholesale and retail values. Most importantly, it gives the bankruptcy court the flexibility to depart from this middle ground whenever circumstances warrant weighing either factor more heavily than the other. In his opinion, the district judge found that use of Local Rule 312(b) resulted in a value that "is within the range that can be 'determined in light of the purposes of the valuation and of the proposed disposition or use of such property.'" *Valenti*, 191 B.R. at 522 (quoting 11 U.S.C. § 506(a)). Therefore, because the valuation of the Valentis' automobile reflects the dual considerations contained in § 506(a), the district court's decision on that issue is affirmed.

### 4. Interest Rate

■ As we recognized in *In re Bellamy*, 962 F.2d at 185–86, full payment under § 1325(a)(5)(B)(ii) includes a "present value" component. In theory, a creditor who receives the "present value" of its allowed claim is placed in the same economic position that it would have been in had it received the value of its allowed claim on the date the reorganization plan was confirmed. *See General Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 66 (3d Cir.1993); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1130 (4th Cir.1993); *In re Dingley*, 189 B.R. 264, 267 (Bankr.N.D.N.Y.1995) (citing 5 *Collier on Bankruptcy* ¶ 1325.06[4][b][iii], at 1325–50). Although § 1325(a)(5)(B)(ii) does not specify which interest rate will provide a creditor with the "present value" of its allowed claim, in *Bellamy* we held that § 1325 requires payment of "market rate" interest.

■ Courts have used various methods to calculate "market rate" interest. The first of these approaches, the "cost of funds" approach, bases the market rate on the rate that the creditor itself pays when it borrows funds. Courts using this approach reason that the best way to place a creditor in the same economic position that it would have been in had the debtor surrendered the collateral immediately is to assume that the creditor would borrow the money representing the value of its allowed claim. Then, the creditor could make new loans to consumers

at prevailing rates in the commercial market. *See United Carolina Bank v. Hall*, 993 F.2d at 1130; *United States v. Doud*, 869 F.2d 1144, 1145–46 (8th Cir.1989); *Koopmans v. Farm Credit Servs.*, 196 B.R. 425, 427 (N.D.Ind.), *aff'd*, 102 F.3d 874 (7th Cir.1996).

■ In contrast, GMAC argues that a "forced loan" approach should be applied to determine the applicable market rate of interest. Under this approach, the bankruptcy court bases the § 1325(a)(5)(B)(ii) interest rate on the rate that the creditor charges for loans of similar character, amount, and duration to debtors in the same geographic region. *See United Carolina Bank*, 993 F.2d at 1130–31; *Hardzog v. Federal Land Bank (In re Hardzog)*, 901 F.2d 858, 860 (10th Cir.1990); *United States v. Southern States Motor Inns, Inc. (In re Southern States Motor Inns, Inc.)*, 709 F.2d 647, 653 (11th Cir. 1983); *Koopmans v. Farm Credit Servs.*, 196 B.R. at 427.

Courts adopting the "forced loan" approach compute "present value" to include the profit that the creditor would have generated had the creditor received the value of the collateral immediately. *General Motors Acceptance Corp. v. Jones*, 999 F.2d at 67, 69; *United Carolina Bank*, 993 F.2d at 1131. As the Third Circuit in *General Motors Acceptance Corp. v. Jones* explains:

> [B]ecause the objective of § 1325(a)(5)(B)(ii) is to put the creditor in the same position it would have been in if it had been allowed to end the lending relationship at the point of the bankruptcy filing by repossessing the collateral, we believe that it would be inappropriate to attempt to exclude consideration of "profit" from a determination of the § 1325 interest rate.

999 F.2d at 69.

■ We believe that courts adopting the "forced loan" approach misapprehend the "present value" function of the interest rate. The objective of § 1325(a)(5)(B)(ii) is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately. The purpose is *not* to put the creditor in the same position that it would have been in had it

64

arranged a "new" loan. *See In re Dingley,* 189 B.R. at 269 (noting that courts favoring the "forced loan" approach "impermissibly recast present value 'so as to preserve the present value of the loan' as opposed to the secured claim").

Moreover, as our analysis in the preceding section illustrates, the value of a creditor's allowed claim does not include any degree of profit. There is no reason, therefore, that the interest rate should account for profit. *See id.* at 269; *see also In re Smith,* 178 B.R. 946, 951 (Bankr.D.Vt.1995) (distinguishing a creditor's "claim" under § 1325(a)(5)(B)(ii), which includes a statutory obligation to pay interest, from a loan, which "includes a contractual obligation to pay interest"); *In re Hudock,* 124 B.R. 532, 534 (Bankr.N.D.Ill.1991) ("[T]he Bankruptcy Code protects the creditor's interest in the property, not the creditor's interest in the profit it had hoped to make on the loan."). Otherwise, the creditor will receive more than the present value of its allowed claim. *See In re Cellular Info. Sys., Inc.,* 171 B.R. 926, 939 (Bankr.S.D.N.Y.1994).

Using the "cost of funds" approach, the district court affirmed the nine percent interest rate specified in the Valentis' reorganization plan. *See Valenti,* 191 B.R. at 522. We agree with the district court that an interest rate based on a "cost of funds" approach more appropriately reflects the present value of a creditor's allowed claim. This approach, however, is difficult for bankruptcy courts to apply efficiently and inexpensively. Because individual creditors borrow funds at different rates, bankruptcy courts would have to conduct evidentiary hearings to determine a creditor's cost of funds on a case-by-case basis. *See In re Hardzog,* 901 F.2d at 860; *In re Dingley,* 189 B.R. at 271. In addition, bankruptcy courts using a "cost of funds" approach are likely to treat debtors inequitably. Chapter 13 debtors would be charged different interest rates depending upon how much their respective creditors have to pay for funds.

Therefore, we hold that the market rate of interest under § 1325(a)(5)(B)(ii) should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan. This method of calculating interest is preferable to either the "cost of funds" approach or the "forced loan" approach because it is easy to apply, it is objective, and it will lead to uniform results. In addition, the treasury rate is responsive to market conditions. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1169 (5th Cir.1993); *Doud,* 869 F.2d at 1145–46; *In re Dingley,* 189 B.R. at 271; *In re Smith,* 178 B.R. at 953; *In re Wynnefield Manor Assocs., L.P.,* 163 B.R. 53, 60 (Bankr. E.D.Pa.1993).

Because the rate on a treasury bond is virtually risk-free, the § 1325(a)(5)(B)(ii) interest rate should also include a premium to reflect the risk to the creditor in receiving deferred payments under the reorganization plan. *See Farm Credit Bank v. Fowler (In re Fowler),* 903 F.2d 694, 697–98 (9th Cir. 1990); *Koopmans v. Farm Credit Servs.,* 196 B.R. 425, 427 (N.D.Ind.), *aff'd,* 102 F.3d 874 (7th Cir.1996); *In re Dingley,* 189 B.R. at 271 (citations omitted); *In re Cellular,* 171 B.R. at 940. A review of the caselaw in those jurisdictions that use this approach to determine a fair rate of interest suggests that the risk premium has been set by bankruptcy courts at from one to three percent. *See, e.g., In re DeMaggio,* 175 B.R. 144, 152 (Bankr.D.N.H.1994); *In re Collins,* 167 B.R. 842, 847 (Bankr.E.D.Tex.1994); *In re Fisher,* 29 B.R. 542, 551–52 (Bankr.D.Kan.1983). The actual rate will depend upon the circumstances of the debtor, including prior credit history as well as the viability of the reorganization plan. We hold that a range of one to three percent is reasonable in this Circuit but leave it to the bankruptcy court in the first instance to make a specific determination. If the parties are unable to stipulate as to the applicable risk premium, then the bankruptcy court may conduct a hearing limited solely to a determination of that premium. *See In re Fowler,* 903 F.2d at 698–99.

Accordingly, because the district court affirmed the nine percent interest rate set forth in the Valentis' reorganization plan using the "cost of funds" approach, we remand

this case to the bankruptcy court for a recalculation of the interest rate based upon the treasury rate plus an additional risk premium.

## III. CONCLUSION

Because the value of the Valentis' automobile, as set forth in their Chapter 13 reorganization plan, accounts for both the purpose of the valuation and the proposed disposition and use of the property, we conclude that it satisfies § 506(a). Therefore, we affirm the district court on that issue. As for the § 1325(a)(5)(B)(ii) interest rate, we vacate the district court's holding and remand for a recalculation of that rate based upon the principles set forth in this decision.