**In re Yehuda TORNHEIM, Debtor.**

**Bankruptcy No. 197–20259–353.**

United States Bankruptcy Court,
E.D. New York.

Oct. 8, 1999.

Yehuda Tornheim, Brooklyn, NY, pro se debtor.

Stuart P. Gelberg, Garden City, New York, Chapter 13 Trustee.

Office of the United States Trustee, Garden City, NY, by Alfred Dimino.

Zavatsky, Mendelsohn & Savino, LLP, Syosset, NY, by Allan B. Mendelsohn, for Creditor First Bank of Beverly Hills, F.S.B.

Joseph Fischer, New York City, pro se Putative Creditor.

### DECISION DISMISSING CHAPTER 13 CASE

JEROME FELLER, Bankruptcy Judge.

#### I.

From its inception on September 15, 1997, this Chapter 13 case has been nothing more than a calculated effort by Yehuda Tornheim, the above-captioned debtor ("Debtor"), to delay the inevitable. Shortly before filing the petition, the Debtor lost a protracted foreclosure battle, after four years of litigation in the state courts, that resulted in the entry of a judgment of foreclosure and sale of his home. The Debtor appealed that judgment in state court, but instead of posting a bond to stay a possible sale of the property, he obtained a cheap alternative—the automatic stay arising by operation of 11 U.S.C. § 362.

By instigating tangential litigation and filing numerous plans replete with largely unfathomable provisions, the Debtor hoped to sidetrack recognition of his underlying inability and lack of intention to pursue a viable repayment plan. The Debtor's efforts were a calculated attempt to enjoy the benefits of Chapter 13 without fulfilling any of the responsibilities. His default in making post-petition mortgage payments was total, and after only five months, he also ceased making plan payments to Stuart Gelberg, Esq., the Chapter 13 trustee ("Trustee"). Moreover, despite this Court's repeated directions, the Debtor refused to provide any documentation regarding his financial status.

At its very core, the Debtor tried to create a fantasy world within the context of his Chapter 13 bankruptcy case. Asserting that because he was objecting to the secured creditor's claim as the holder of the mortgage on his property, he did

not know whom to pay and thus need not pay anything. He also argued that the secured creditor and the Chapter 13 trustee had no standing to appear in opposition to his objection. Although purportedly appearing *pro se*, these bizarre tactics were aided by behind-the-scenes legal guidance provided by Gerald Zwirn, Esq., the Debtor's attorney of record in the state court foreclosure action, and by the frequent appearance and support of Joseph Fischer, a purported creditor,[1] whose penchant for pursuing frivolous and duplicative litigation is well documented.[2]

The Trustee and the Office of the United States Trustee have moved to dismiss the Debtor's bankruptcy case. Clearly, the Debtor filed the instant case as a facile alternative to posting a bond to stay the foreclosure of his home. Utilizing the automatic stay to stave off foreclosure without a concomitant attempt to repay debt is an untenable abuse of the Bankruptcy Code which this Court will not countenance. Accordingly, for all of the reasons hereinafter set forth, the Trustee's motion to dismiss the Debtor's Chapter 13 bankruptcy case is granted with prejudice.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

## II.

Nearly nine years ago, on November 30, 1990, the Debtor obtained a $180,000.00 mortgage from Green Point Savings Bank which called for monthly payments of $1,699.53 over thirty years ("Mortgage"). The Mortgage is secured by a one-family home located at 2820 Quentin Road in Brooklyn, New York ("Property"). In December 1992, after making payments for only twenty-three months, the Debtor defaulted and since that time has made no further payments on the Mortgage.

By April 1993, foreclosure proceedings were commenced in state court. After four years of litigation, a judgment of foreclosure and sale was entered on June 26, 1997. The Debtor appealed that ruling, but did not post a bond to secure a stay of the foreclosure pending the outcome of the appeal.[3] Instead, one day prior to a scheduled sale of the Property, the Debtor filed a petition for relief under Chapter 13 for only a nominal filing fee, thereby triggering the automatic stay that arises pursuant to 11 U.S.C. § 362.

The Debtor's initial Chapter 13 plan ("Plan"), ostensibly contemplated curing the pre-petition Mortgage arrears by employing a complicated thirty-six month formula that called for six semi-annual payments (i.e., payments in the sixth, twelfth, eighteenth, twenty-fourth, thirtieth, and

1. Fischer appeared at hearings throughout this case, supposedly, at first, to protect his security interest in the Debtor's home. This Court directed Fischer to provide evidence of his secured claim. After substantial foot-dragging, Fischer explained in somewhat muddled fashion that the failure to provide proof was due to the fact that his office had been vandalized. Ultimately, the Debtor' schedules were amended to reflect Fischer as holding an unsecured claim, rather than a secured claim, of $25,000.00. No proof was ever submitted by Fischer to support the unsecured claim. Zwirn has represented Fischer in various bankruptcy cases in which the latter has been involved.

2. By order dated June 2, 1997, The Second Circuit Court of Appeals sanctioned Fischer for filing a frivolous appeal in *In re 47 Charles Street, Inc.*, 95–CV–7063. The order detailed Fischer's "history of abusive litigation and dilatory tactics" and required Fischer to obtain the court's permission prior to submitting anything to the Second Circuit, expressly limiting any such request to three pages. Fischer was also ordered to present a copy of the sanctions order to any court in the Second Circuit, whether state or federal, in which he was pursuing litigation either at that time or in the future. In addition, at a hearing conducted on March 12, 1998, in *Joseph Fischer v. 47th Street Photo, Inc.* 97 Civ. 0457, the District Court for the Southern District of New York outlined a sanctions order patterned after the Second Circuit's.

3. On May 3, 1999, the appellate division affirmed the state court judgment of foreclosure and sale. See *Green Point Savings Bank v. Tornheim,* —— A.D.2d ——, 689 N.Y.S.2d 193 (1999).

thirty-sixth months), each in the amount of 18.33% of the pre-petition arrearage of approximately $104,000.00. It further provided that in every month in which no semi-annual payment would become due (i.e., months one through five, seven through eleven, thirteen through seventeen, nineteen through twenty-three, twenty-five through twenty-nine, and thirty-one through thirty-five) a monthly interim payment of $500.00 would be made. Each group of five interim payments (for a total of $2,500.00) would be credited to the corresponding semi-annual payment.

The Debtor also widened the legal battles being waged against the successor in interest to the Mortgage, First Bank of Beverly Hills, F.S.B. ("First Bank"). In addition to the state court litigation, the Debtor challenged First Bank's status as mortgagee by filing an objection to claim in the instant bankruptcy case ("Objection to Mortgage Claim"). He did not, however, challenge the overall validity of the Mortgage, the total Mortgage indebtedness, or the amount of the Mortgage arrears. In fact, on at least one occasion during the pendency of this case, the Debtor voiced a desire to negotiate a short sale with First Bank. In any event, consistent with his allegation that First Bank was not the mortgagee, the Plan provided that instead of remitting monthly post-petition Mortgage payments directly to the mortgagee, those payments were to be forwarded to the Trustee, who would escrow those sums for the mortgagee's benefit.

At an adjourned hearing on confirmation, however, the Trustee revealed that despite the passage of nearly seven months since the inception of the bankruptcy case, no post-petition Mortgage payments had as yet been made either to him or to First Bank. The Trustee also noted that although he had received the first five monthly Plan payments of $500.00, he was skeptical regarding the sixth payment (the first semi-annual payment), which would come due on April 20, 1998. That payment amounted to approxi-

mately $16,500.00 ("Lump Sum Amount"), which represented 18.33% of the arrearage, or about $19,000.00, minus the $2,500.00 interim payment credit.

The Debtor responded to the Trustee's concerns by arguing that post-petition Mortgage payments could not be made prior to determining the rightful holder of the Mortgage, and awaited resolution of his Objection to Mortgage Claim. In essence, the Debtor simply ignored the escrow provision in his own Plan and complained that he did not know whom to pay.

This Court, cognizant of the prolonged state court litigation which had taken over four years to complete and was pending further appeal, suspected that the Objection to Mortgage Claim was yet another dilatory tactic designed to further prejudice the holder of the Mortgage. The Court determined, therefore, that it was both necessary and appropriate to test the Debtor's good faith by expressly mandating adherence to his Chapter 13 responsibilities. The Trustee was instructed to settle an order, which was eventually signed on May 6, 1998 and made effective *nunc pro tunc* to the April 8 hearing, directing the Debtor to remit the Lump Sum Amount and make post-petition Mortgage payments either to the Trustee or directly into an escrow account ("Order Directing Mortgage and Plan Payments").

Prior to entry of the Order Directing Mortgage and Plan Payments but after the Lump Sum Amount had become due, the Debtor attempted to avoid paying those monies by amending his schedules and filing a second plan on April 30, 1998 ("First Amended Plan"). The Debtor's amended schedules indicated that the Property was rental property rather than a primary residence. Essentially, the Debtor attempted to transform the entire underpinning of his bankruptcy case. By removing the constraints of 11 U.S.C. § 1322(b)(2), which only allows plans to "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal

residence," the Debtor could now propose a cramdown of the mortgage.

After entry of the Order Directing Mortgage and Plan Payments, the Debtor filed a motion seeking vacatur of that order pursuant to Fed.R.Civ.P. 60(b) ("Motion to Vacate Order Directing Plan and Mortgage Payments"). That motion asserted that the Plan had been effectively superceded by the First Amended Plan. Thus, according to the Debtor, payment of either the Lump Sum Amount or any post-petition Mortgage amount was unnecessary; the provisions in the Plan which formed the basis for the Order Directing Mortgage and Plan Payments had been rendered moot.

Thereafter, the Trustee, together with the Office of the United States Trustee, filed a motion seeking dismissal of the case ("Motion to Dismiss"). The Debtor's Motion to Vacate Order Directing Plan and Mortgage Payments, Objection to Mortgage Claim, and a motion to direct First Bank to produce certain documents and impose monetary sanctions ("Motion to Direct Production of Documents and Impose Monetary Sanctions"), were calendared together with the Motion to Dismiss and set for the adjourned hearing on confirmation on July 29, 1998.

At that hearing, the Court denied the Motion to Vacate Order Directing Plan and Mortgage Payments and an order to that affect was entered on August 21, 1998.[4] The denial was based primarily on this Court's finding that the Debtor's amendment of the Plan was a transparent ruse to retroactively absolve him from paying the Lump Sum Amount and to seek indefinite avoidance of making any post-petition Mortgage payments. Rather than imposing any objectionable burdens upon the Debtor, the Order Directing Plan and Mortgage Payments merely provided that he fulfill fundamental obligations demanded of all Chapter 13 debtors: to make monthly post-petition Mortgage payments as they became due, and uphold his commitment under the Plan to pay the Lump Sum Amount when it became due.

The sequence for resolving the remaining contested matters was also resolved at the July 29 hearing. The Court concluded that the Objection to Mortgage Claim and the Motion to Direct Production of Documents and Impose Monetary Sanctions, like other papers filed by the Debtor, likely raised issues presented in the state court appeal. Hence, they represented little more than duplicative, satellite litigation designed to befuddle administration of the bankruptcy case and camouflage the Debtor's overall objective of not making any Chapter 13 plan payments or post-petition Mortgage payments for, at least, the foreseeable future. On the other

---

4. After entry of this order, the Debtor timely filed a Notice of Motion for Leave to Appeal from the Order Directing Plan and Mortgage Payments. On November 11, 1998, the United States District Court for the Eastern District of New York granted the Debtor's Motion for Leave to Appeal. Subsequently, on December 3, 1998, the Debtor moved for a stay pending appeal.

By order dated December 24, 1998, the motion was denied for, among other reasons, the failure to demonstrate a substantial possibility of success on appeal. The Debtor superficially maintained that there was a substantial possibility of success because the Order Directing Plan and Mortgage Payments related to the Plan, which had been superceded by subsequently filed plans. Similar to many of the Debtor's arguments, that contention was not only deceptive, but

more importantly both wrong and misguided.

Even though the Debtor's later plans replaced his original plan, it is wrong to infer that a Chapter 13 debtor can by whim vitiate obligations that have already attached. Generally, amendments to Chapter 13 plans effectuate a change of obligations *in futuro* only. Certainly, Chapter 13 plan defaults cannot be cured retroactively by simply filing amended plans. See *In re Walters*, 223 B.R. 710 (Bankr.W.D.Mo.1998). Although an amended plan does replace a prior plan, "this means that the amended plan terms simply become the new terms. The replacement does not alter obligations which have already accrued." *Id.* at 713.

The district court ultimately dismissed the appeal by order dated March 15, 1999.

hand, the Motion to Dismiss raised threshold issues regarding the Debtor's good faith filing and maintenance of the bankruptcy case, in addition to plan feasibility. Accordingly, the Court determined that the Motion to Dismiss should be resolved, together with any and all issues regarding confirmability of the Debtor's Chapter 13 plan, prior to moving forward with ancillary matters.

In an attempt to clarify those issues, the Court ordered the Debtor to provide basic information, virtually all of which had not been supplied despite the passage of over fifteen months since the filing of the petition. The Debtor was to provide the Trustee operating reports for the postpetition period that the Debtor was purportedly self-employed; pay stubs from Mirage Tech, Inc., the alleged post-petition employer of the Debtor; pay stubs from Bowery Plumbing and Heating, alleged employer of the Debtor's spouse; and tax returns for 1997, either a joint return filed by the Debtor and his spouse, or both individual returns. The Debtor was also ordered to submit detailed information of his relationship to certain real estate other than the Property. Furthermore, the Court was also concerned that the Property, which was designated as the Debtor's residence in the state court litigation and presumably remained as such in his initially filed schedules, was now suddenly a one-family home occupied solely by lessees.

During the interim between the filing of the First Amended Plan and the July 29 hearing, the Debtor had filed three additional Chapter 13 plans, designated as either amendments, modifications, or corrections, on May 4, May 15, and June 25. The Court recognized that because of the largely inscrutable provisions and the sheer multiplicity of the plans, as well as the apparent strategically timed filing of certain plans, the Debtor had infused chaos into the bankruptcy case. The continuing confusion caused by the rapid filing of four Chapter 13 plans required some remedial step so that administration of the case might proceed in an orderly and apprehensible manner. Therefore, the Court also determined that the Debtor's latest plan, filed on June 25, 1998, was the operative Chapter 13 plan in the case ("Fourth Amended Plan"), and barred the Debtor from filing any future plans absent prior order of the Court.

■ The Fourth Amended Plan was clearly drafted after substantial tinkering, and further illustrates the exertions expended to forestall making any payments to either the Trustee or towards the Mortgage. The Fourth Amended Plan is a cramdown plan that envisions, among other amorphous and complicated provisions, a strip down of the Mortgage which is to be repaid by making a large balloon payment at the conclusion of the 60 month plan.[5] The Debtor also added another "re-

---

**5.** Although no documentation is provided by the Debtor to support his valuation of the Property, the Fourth Amended Plan strips down the Mortgage on the Property to a $170,000.00 secured portion. That amount will be paid with interest "fixed at the rate on a United States Treasury instrument with a maturity equivalent to the five (5) year repayment schedule under this plan, plus a premium of one (1) percent per annum." (Fourth Amended Plan, ¶ 7). Repayment of the Mortgage would be in monthly payments of $1,275.00, with "[t]he balloon balance remaining at the end of the plan, ... paid in one lump sum as the 60th payment." (Fourth Amended Plan, ¶ 9).

Disregarding the Debtor's assumption that a 1% premium is appropriate in this case, *see*

*General Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55, 64 (2d Cir.1997) (holding that cramdown interest should be set at the rate of a treasury bond plus, depending on the circumstances of the debtor, a one to three percent premium), *abrogated on other grounds by Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), if an interest rate of between 6% and 9% is applied, the Court estimates that the balloon payment will fall somewhere between $140,000.00 and $170,-000.00.

Without question, plans may contain balloon payments in situations where it is shown that the mortgage debt will be significantly reduced and result in sufficient equity build up, thereby indicating a significant likelihood

finement" from his previously filed plans, the concept of an "effective date".

In essence, the Fourth Amended Plan provides that the Debtor need not make any regular monthly plan payments until the effective date, which is defined to mean "when a final judicial determination is rendered as to the rightful owner and holder of mortgage security and lien, the mortgage note indebtedness, and the claim-in-bankruptcy arising thereunder." (Fourth Amended Plan, ¶ 13). The Debtor's new formulation removes any requirement to make payments to the Trustee or towards the Mortgage while he seeks a determination of what entity holds the mortgage. Instead, he attempts to indefinitely suspend all payments under his Chapter 13 plan until that determination is made.

On September 24, 1998, the Court conducted an adjourned confirmation hearing together with an adjourned hearing on the Motion to Dismiss. At the hearing, the Debtor presented no evidence supporting the feasibility of his Chapter 13 plan. Moreover, he failed to present any of the documentary evidence previously ordered by the Court. Instead, the Debtor offered only implausible and self-serving testimony to feebly advance the notion that he simply possessed no financial records: he receives cash payments from his job at Mirage Tech, Inc., a family business; neither he, nor his wife, had filed tax returns for a number of years; and although she had an offer of employment with Bowery Plumbing and Heating, his wife never actually started work there.[6]

The Debtor also testified that he received living space with relatives as a benefit of his employment in the family business, and provided an unexecuted, form lease to evidence the rental of the Property. Regarding operating reports for the time that he was self employed, the Debtor provided none. Previously self-employed as a real estate manager, the Debtor testified that he could not remember for whom he managed real estate, the addresses of any of the properties he managed, or even an approximation of his monthly income. Basically, other than his testimony, which was just incredulous, the Debtor submitted no proof of any source of regular income to fund a Chapter 13 plan.

### III.

The Debtor fails to satisfy even the most fundamental obligations inherent in a Chapter 13 case. The cornerstone of any bankruptcy case is a debtor's fidelity to candid and accurate financial disclosure. See Jones v. United States (In re Jones), 134 B.R. 274, 279 (N.D.Ill.1991); In re Baumgartner, 57 B.R. 513, 516 (Bankr. N.D.Ohio 1986); LaVangie v. Mazzola (In re Mazzola), 4 B.R. 179, 181–82 (Bankr. D.Mass.1980). In addition to full and truthful financial disclosure, a regular source of income is of crucial importance to any serious debtor determined to pursue a successful plan under Chapter 13.

Without the requisite income, the stark reality is that any attempt to reorganize is doomed to fail. The Bankruptcy Code reflects this axiomatic truth by setting forth eligibility requirements for Chapter 13 debtors, including the requirement that

that the debtor could obtain refinancing of the property. See In re St. Cloud, 209 B.R. 801, 810 (Bankr.D.Mass.1997) (ruling that a plan was confirmable relating to property valued at $82,000.00, with payments during the life of the plan of $70,000.00, and a balloon payment of $47,000.00). However, "[t]o avoid potential abuse, debtors must show by definite and credible evidence that they will have the financial ability to make the balloon payment." First Nat'l Bank of Boston v. Fantasia (In re Fantasia), 211 B.R. 420, 423 (1st Cir. BAP 1997); accord In re Crotty, 11 B.R. 507,

511 (Bankr.N.D.Tex.1981). Here, the large balloon payment with little equity in the property, combined with mere speculation regarding the source of funds to make that payment, suggests that this is simply one more delaying tactic.

6. The Debtor's original Schedule I annexed to his bankruptcy petition reported that his wife's current monthly wages from Bowery Plumbing and Heating was $2,580.00.

"[o]nly an individual with regular income ... may be a debtor under chapter 13 of this title." 11 U.S.C. § 109(e). The Bankruptcy Code defines the term "individual with regular income" as an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title." 11 U.S.C. § 101(30).

 It is equally clear that a debtor has the burden to show that he or she has regular income. *In re Antoine*, 208 B.R. 17, 19 (Bankr.E.D.N.Y.1997) (citing *In re Norwood*, 178 B.R. 683, 691 (Bankr. E.D.Pa.1995)). A debtor who "does not produce credible evidence of the existence of a regular income, ... does not qualify for Chapter 13 relief under 11 U.S.C. § 109(e)." *In re Sassower*, 76 B.R. 957, 961 (Bankr.S.D.N.Y.1987) (citing *In re Wilhelm*, 6 B.R. 905, 908 (Bankr.E.D.N.Y. 1980)). "There must be some factual basis for the court to determine the regularity and stability of the debtor's income." *In re Mozer*, 1 B.R. 350, 352 (Bankr.D.Colo. 1979).

 In the instant case, notwithstanding this Court's explicit orders and numerous informal directives to provide basic financial data and any documentation to support a finding that he might have the financial wherewithal to fund a viable Chapter 13 plan, the Debtor has offered no tangible evidence of income whatsoever. The Debtor's failure in this regard strongly indicates that he is ineligible for Chapter 13 relief. Furthermore, once the Court explicitly ordered him to make these financial disclosures, his failure to produce even a shred of documentary evidence constitutes ample grounds for dismissal of the case. *See Vomhof v. United States*, 207 B.R. 191, 193 (D.Minn.1997); *In re Krattiger*, 52 B.R. 383, 385 (W.D.Wis.1985).

 Even assuming that the Debtor had complied with this Court's orders, and further assuming that the Debtor was in fact eligible to be a Chapter 13 debtor, this case should nonetheless be dismissed for his failure to make monthly plan payments. Although the Trustee initially received certain payments, they ceased after only five months, and no further payments have been received by the Trustee since March of 1998. It is beyond argument that the failure to make plan payments is violative of Chapter 13:

Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including

... failure to commence making timely payments under section 1326 of this title.

11 U.S.C. § 1307(c)(4). Thus, "[un]less the court orders otherwise, the debtor shall commence making the payments proposed by a plan within 30 days after the plan is filed." 11 U.S.C. § 1326(a)(1).

 Under the terms of the current plan, payments are not to commence until the "effective date." In other words, the Debtor's Fourth Amended Plan attempts to indefinitely avoid remitting any monies by pegging the inception of payments upon the occurrence of some future development. Where there is no intention to remit monthly plan payments to a trustee until some remote event occurs, a Chapter 13 plan clearly runs afoul of the Bankruptcy Code.

The Chapter 13 case of *In re Nowak*, 143 B.R. 154 (Bankr.N.D.Ill.1992), presents a similar scenario. The debtors listed the Internal Revenue Service ("IRS") as their only creditor, and submitted a plan to repay certain disputed federal taxes, valued by the IRS at roughly $430,000.00. According to the debtors' plan, payments of $500.00 a month would only commence once the IRS actually proved entitlement to the monies. *See id.* at 159. In ruling

that such a plan was subject to dismissal, the court stated that "[c]learly, chapter 13 was not enacted to grant debtors a hiatus from paying bills while their liability is adjudicated and a payment plan worked out." *Id.* at 160; *cf. In re Jones,* 174 B.R. 8, 12 (Bankr.D.N.H.1994) (dismissing case based on the contingent recovery of monies to fund the debtor's Chapter 13 plan, which called for monthly payments of only $10.00 before increasing payments to $600.00 upon the successful completion of the debtor's adversary proceeding).

Furthermore, if we were to credit in any manner the Debtor's amended schedules, his post-petition receipt of rental income leads to an entirely untenable result. The proposed plan would permit him to collect rent and indefinitely delay making any payments to the mortgagee. In *In re Wilson,* 117 B.R. 714 (Bankr.M.D.Fla. 1990), the court stated that a debtor who avoids making payments to mortgage creditors while renting property is a particularly evil abuse of the Bankruptcy Code. We agree with that court's further observation that such a situation "not only illegitimately delays creditors ..., but it also allows the debtor to profit by the collection of rent while preventing the mortgagee from collecting the mortgage." *Id.* at 715.

■ Of course, the Bankruptcy Code is to afford the honest but unfortunate debtor " 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' " *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). But that objective is tempered by an awareness that debtors who lack good faith cannot be rewarded with the benefits of the bankruptcy process. *See Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.),* 825 F.2d 296, 297–98 (11th Cir.1987).

■ Although there is nothing inherently unacceptable with filing a Chapter 13 petition to block foreclosure of a home, a debtor must commit to a "legitimate effort at reorganization" by devoting his or her available income to cure the arrearages. *Mortgage Mart, Inc. v. Rechnitzer (In re Chisum),* 68 B.R. 471, 473 (9th Cir. BAP 1986), *aff'd,* 847 F.2d 597 (9th Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). However, "[w]hen a bankruptcy case has been filed only for the purpose of inhibiting or forestalling a foreclosure action on the debtor's assets without the intention of financial rehabilitation, the case should be dismissed as having been filed in bad faith." *In re Earl,* 140 B.R. 728, 739 (Bankr.N.D.Ind.1992).

■ Investigation of a debtor's bad faith in filing and maintaining a Chapter 13 case requires a careful examination of the totality of the circumstances on a case-by-case basis, *see In re Klevorn,* 181 B.R. 8, 11 (Bankr.N.D.N.Y.1995). A court's analysis should therefore consider various factors, including: whether (1) the debtor has only one asset; (2) that asset is encumbered by secured liens; (3) the petition was filed on the eve of foreclosure; (4) the sole or major asset of the debtor is the foreclosed property; (5) the pre-petition conduct of the debtor was proper; (6) there are available sources of income to fund a repayment plan; (7) there are few, if any, unsecured creditors; (8) the reorganization essentially involves the resolution of a two party dispute; and (9) the debtor filed the bankruptcy case solely to invoke the automatic stay. *See id.; In re Cornelius,* 195 B.R. 831, 836 (Bankr.N.D.N.Y. 1995); *see also Little Creek Dev. Corp. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Corp.),* 779 F.2d 1068, 1072–73 (5th Cir.1986) (utilizing similar factors in the context of a Chapter 11 case).

■ The facts in this case resonate negatively within each of these factors. A consideration of the entire record inexora-

bly leads us to conclude that the instant petition was filed for improper motives totally devoid of any good faith effort to repay debt. The Debtor's focus has been almost entirely centered on attacking the claim of First Bank as holder of the mortgage. And rather than legitimately proposing and funding a Chapter 13 plan, the effort expended has been to secure delay in making any payments whatsoever by the filing of numerous plans that contain predominantly unadministerable and unconfirmable provisions. *See Setzer v. Hot Productions, Inc. (In re Setzer)*, 47 B.R. 340, 347 (Bankr.E.D.N.Y.1985) ("The debtor's unusual proposed plan, and its failure to provide definitive, assessable, and practical guidelines for a present reorganization is evidence of the debtor's attempt to manipulate the bankruptcy law to his advantage rather than attempting honestly to repay his debts.").

Despite his sporadic assertions of having the utmost desire and ability to repay the arrearages, the Debtor has droned the almost talismanic mantra that he does not know who holds the Mortgage or how much to pay. According to the Debtor, this constitutes license to suspend indefinitely any payments towards the Mortgage. However, the Debtor's incessant refrain is a red herring. Until the Mortgage is actually modified, the Debtor must make payments as originally contracted. He cannot simply suspend payments until final resolution of the Objection to Mortgage Claim is reached.

The Debtor's Chapter 13 formula envisions that he need not make plan payments until occurrence of the "effective date." Thus, his current plan fails to comply with the requirement to commence making payments within thirty days of filing a plan. That requirement is an obligation necessarily recognized by all debtors who attempt to save real property from possible foreclosure through a Chapter 13 plan. The Debtor's refusal to acknowledge that responsibility reveals his utter inability or unwillingness to fund a viable Chapter 13 plan and exposes his actual motive for filing the instant Chapter 13 case—a purposeful manipulation of the bankruptcy process, designed merely to obtain delay prejudicial to creditors. *See In re Walker*, 102 B.R. 612, 615 (Bankr. N.D.Ohio 1989) (ruling that where the debtor has no intent to effectuate a repayment plan, and instead "employs the bankruptcy process as a tactic to prolong her rent-free occupancy and to force her mortgagee to re-structure the loan, ... the system is being seriously abused."); *see also In re Roberts*, 117 B.R. 677, 678 (Bankr.N.D.Okla.1990) (dismissing case on finding that Chapter 13 petition was filed in bad faith solely to avoid posting a bond in connection with a state court appeal).

### CONCLUSION

The most troubling aspect of this saga is that the Debtor, aided by a putative creditor and legal counsel that never appeared or signed a piece of paper filed in the case, seems to believe that the bankruptcy system is a legal playground where one can indulge in an elaborate catch-me-if-you-can with a court, a trustee, and creditors. Although the law grants a generous measure of relief to debtors, this benefit is not gratuitous. The law also imposes a measure of responsibility. Persons who invoke the protection of the bankruptcy laws should be especially aware of this requisite. The game attempted in this case cannot be permitted to recur.

For all of the above-stated reasons, the Debtor's Chapter 13 case is dismissed. Given the Debtor's gross abuse of the bankruptcy process, including his bad faith filing and maintenance of the bankruptcy case, dubious testimony given under oath, and continuing lack of compliance with orders of this Court, the dismissal is with prejudice to refiling a bankruptcy case under any chapter of the Bankruptcy Code in any court of the United States for a period of two years.